[No. B003300. Second Dist., Div. Seven. Dec. 18, 1984.]

JOSEPH C. SHELL, Plaintiff and Respondent, v.
GEORGE J. DARNEILLE, as Trustee, etc., Defendant and Appellant.

**[Opinion certified for partial publication.†]**

†The entire opinion is certified for publication pursuant to rules 976 and 976.1 of the California Rules of Court with the exception of parts A. 2 and B. of the Discussion.

COUNSEL

McCutchen, Black, Verleger & Shea, G. Richard Doty, Peter W. James and Judd L. Jordan for Defendant and Appellant.

Richards, Watson, Dreyfuss & Gershon, Richard Richards and Donald Stern for Plaintiff and Respondent.

**OPINION**

**JOHNSON, J.**—A jury awarded plaintiff $450,000 as compensation for successfully negotiating modifications to an oil drilling lease on behalf of defendant. Defendant claims plaintiff's recovery is barred by the statute of frauds and his breach of a fiduciary duty; alternatively, defendant claims it is entitled to a new trial on the issue of compensation. We reject defendant's claims and affirm the judgment.

### FACTS AND PROCEEDINGS BELOW

Plaintiff Joseph Shell is a well-known figure in the California oil business and politics. He began his work in the oil industry in 1946 and continued in that field except for the period 1953-1963 when he served in the state Legislature. After leaving the Legislature, the combination of oil and politics led naturally to a career as a lobbyist for oil interests in the state capitol. It was as a lobbyist for oil interests Shell first had business dealings with defendant Westates Petroleum Company.

Westates became a client of Shell's in 1971 and he represented the company through 1976. In addition to lobbying for Westates, on two occasions Shell negotiated with the Standard Oil Company on Westates' behalf to obtain extensions of a drilling lease known as the Commercial Maine State lease (hereinafter the lease). Shell neither asked for nor received any compensation for these negotiations except his out-of-pocket expenses.

In the spring of 1976, Horace Thompson, chairman of the board of directors of Westates, called Shell and asked if Shell could assist Westates once again with Standard—he indicated Westates was having new problems with this same lease. A division of Santa Fe had made an offer to purchase Westates, but Santa Fe had demanded Westates first clear up certain problems with this lease. Thompson explained Westates could not approach Standard directly because of a breakdown in the Westates-Standard relationship following Shell's previous negotiations. Thompson requested Shell to intercede with Standard on Westates' behalf to obtain the new lease modifications required. Shell told Thompson he would first have to determine whether or not he might be able to accomplish what Westates needed.

In early June of 1976, Shell told Thompson he thought he could obtain the requested modifications to the lease from Standard. As discussed more fully below, Shell and Thompson then specifically agreed any work Shell did to obtain the desired lease modifications for Westates was outside the scope of the lobbying agreement between Shell and Westates. Shell explicitly contrasted the existing 1976 situation with that which had existed during

1971 when he had negotiated the lease amendments for Westates, and he further stated that this time he insisted upon being properly compensated. Shell told Thompson he still was not certain he could accomplish what Westates required, and he would bill nothing for his services if he were unsuccessful and the Westates purchase by Santa Fe was not consummated. However, if he were successful, Shell told Thompson, he would expect to be paid the full fair and reasonable value of what he was able to accomplish for Westates. Thompson agreed, and told Shell he would see Shell was "adequately compensated" if he were successful.

Shell and Thompson agreed if Shell were to be successful they would then determine the value to Westates of what Shell had accomplished, and they would then set the level of Shell's compensation, based upon what Shell had obtained for Westates.

Shell testified that although he knew the lease modifications he was hired to obtain were very valuable, at the time he was hired by Thompson he did not know the full extent of their value. However, although the actual numbers concerning the value of the lease rights Shell was hired to obtain were not then known to either of them, Shell testified he and Thompson agreed Shell's compensation would be based on the value of what Shell obtained for Westates.

In a subsequent telephone conversation between Shell and Thompson, Thompson stated that Westates' board of directors had approved Shell's hiring for this task. Up to this point, the agreement between Shell and Thompson was oral. Thompson later executed a writing which stated Westates hired Shell and expected to pay him.

Shell and Thompson subsequently orally agreed the compensation to be paid by Westates to Shell would be based upon Shell's obtaining modifications to the lease which they agreed increased its value by $9 million.

Shell was able to obtain the necessary modifications to the lease—principally secondary recovery rights which constituted most of the value of the lease as far as the prospective purchaser of Westates' assets, Santa Fe, was concerned.

Basing the value of his services to Westates at $9 million, Shell requested a 10 percent commission, $900,000. Westates offered $25,000. Shell rejected this offer and sued to recover on his contract with Westates.

DISCUSSION

A. Liability Issues

Westates denies liability under the agreement based on the statute of frauds and Shell's alleged breach of a fiduciary duty.

1. *The Statute of Frauds Is Not Applicable to the Agreement Between Shell and Westates*

■ Westates claims it has no legal duty to pay Shell anything for his work because its contract with him is invalid under the statute of frauds. Westates relies on Civil Code section 1624 subdivision 5 which pertains to "An agreement authorizing an agent . . . to purchase or sell real estate, or to lease real estate for a longer period than one year . . . for compensation or a commission. . . ."

We reject Westate's claim for two reasons.[1]

First, Shell was not hired to procure a lease for Westates but to obtain an amendment or modification of an existing lease. The statute, on its face, does not apply to an agreement to procure an amendment or modification of an existing lease and we perceive no basis for giving it such a broad interpretation.

■ "It is the policy of California courts to construe the statute of frauds restrictively. Unless the statute clearly requires an agreement or authority to be in writing the statute is not to be applied." (*Ripani* v. *Liberty Loan Corp.* (1979) 95 Cal.App.3d 603, 610 [157 Cal.Rptr. 272]; and see *Sunset-Sternau Food Co.* v. *Bonzi* (1964) 60 Cal.2d 834, 838 [36 Cal.Rptr. 741, 389 P.2d 133].) ■ The purpose of subdivision (5)—formerly subdivision (6)—has always been to protect buyers and sellers of real estate from false claims for broker's commissions. (*Gorham* v. *Heiman* (1891) 90 Cal. 346, 358 [27 P. 209]; *Grant* v. *Marinell* (1980) 112 Cal.App.3d 617, 619-620 [169 Cal.Rptr. 414].) The 1963 amendment making subdivision (5) applicable to leases in excess of a year was intended to provide this same protection to landlords and tenants. (*Selected 1963 Legislation* (1963) 38 State Bar J. 649.) ■ Whatever need there may be for this protection at the inception of the lease, we see no purpose in applying the statute when a party hires an agent to try to procure subsequent amendments or modifications to the lease.

---

[1]Because we find the statute of frauds inapplicable, we do not reach the question whether Thompson's memorandum of understanding satisfies the requirement of a writing.

The draconian consequences of applying the statute of frauds is another consideration dissuading us from applying it to this transaction. In this case it would permit Westates, which concedes it hired Shell to renegotiate its lease, to retain the benefit of Shell's endeavor on its behalf, in the neighborhood of $9 million, but to pay him nothing. (See *Keely* v. *Price* (1972) 27 Cal.App.3d 209, 214 [103 Cal.Rptr. 531]; *King* v. *Tilden Park Estates* (1958) 156 Cal.App.2d 824, 827 [320 P.2d 109].)[2]

Our second reason for rejecting Westates' defense is that the agreement in question did not result in the leasing of real estate but of personal property. Subdivision 5 clearly does not apply to sales, purchases or leases of personal property. (*Meadows* v. *Clark* (1939) 33 Cal.App.2d 24, 28-29 [90 P.2d 851].)

■ Our Supreme Court has held "real estate," for purposes of section 1624 subdivision 5, is defined in accordance with the common law definition of that term. (*Dabney* v. *Edwards* (1936) 5 Cal.2d 1, 6 [53 P.2d 962, 103 A.L.R. 822].) In *Callahan* v. *Martin* (1935) 3 Cal.2d 110, 118-120 [43 P.2d 788, 101 A.L.R. 871], the court construed a lease of oil drilling rights as a lease of personal property if for a term of years and a lease of real estate if for life or in perpetuity. It is important to note subdivision 5 applies to a "lease [of] real estate" not the leasing of an "interest" in real estate. (Cf. § 1624, subd. 4; *Dabney* v. *Edwards, supra,* 5 Cal.2d at p. 5.) ■ Although a lease of drilling rights for a fixed period of years creates an interest *in* real estate which must be in writing to be enforceable, (Civ. Code, § 1624, subd. 4; *Dabney* v. *Edwards, supra,* at p. 5) it does not constitute the leasing *of* real estate, but a chattel real, which is personalty and not within subdivision 5. (*Dabney* v. *Edwards, supra,* at p. 6; see *Callahan* v. *Martin, supra,* 3 Cal.2d at p. 118.) Here, it is undisputed the lease, as amended, gave Westates secondary drilling rights for a fixed term of years. Thus, the lease that is the basis of Shell's claim for compensation does not fall within the purview of subdivision 5.

Westates argues the original lease was for an indefinite period, therefore real estate, and in procuring the amended lease it "sold" or "exchanged" the original one. There is no evidence to back up Westates' claim it employed Shell to sell or exchange its lease. The only witness to the oral

---

[2]One justification for this harsh result is that real estate brokers are presumed to know the laws relating to real estate transactions. Thus, if they fail to obtain proper written authorization for their services they have no one to blame but themselves if their services go unrewarded. (*Pac. etc. Dev. Corp.* v. *Western Pac. R. R. Co.* (1956) 47 Cal.2d 62, 70 [301 P.2d 825].) This rationalization does not fit the case before us. Shell is not a real estate broker but a lobbyist for oil companies. The task he undertook for Westates was outside his normal endeavors as a lobbyist.

agreement, other than Shell, was Thompson, Westates' board chairman. Thompson testified Shell was employed to obtain a modification of the existing lease to include secondary drilling rights and handle other problems involving Westates' and Standard's operations under the lease. There was no mention of selling the lease. Furthermore, bearing in mind the discussion, *ante* at page 962, we are not inclined to strain to construe the modification of a lease as a "sale" where the sole purpose in doing so would be to deny an innocent party the compensation due him.

2. *Shell Did Not Breach His Fiduciary Duty to Westates*\*

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

### DISPOSITION

The judgment is affirmed.

Lillie, P. J., and Thompson, J., concurred.

A petition for a rehearing was denied January 16, 1985, and appellant's petition for a hearing by the Supreme Court was denied March 14, 1985.

---

\*See footnote, *ante,* page 957.