[No. B149851. Second Dist., Div. Seven. Mar. 19, 2002.]

KEVIN A. COPELAND, Plaintiff and Appellant, v.
BASKIN ROBBINS U.S.A. et al., Defendants and Respondents.

COUNSEL

David J. Cowan for Plaintiff and Appellant.

Farella Braun & Martel, John L. Cooper, Thomas B. Mayhew; Fenigstein & Kaufman and Karl S. Thurmond for Defendants and Respondents.

OPINION

**JOHNSON, Acting P. J.**—We address an unsettled question in California: may a party sue for breach of a contract to negotiate an agreement or is such a "contract" merely an unenforceable "agreement to agree?" We hold a contract to negotiate an agreement is distinguishable from a so-called "agreement to agree" and can be formed and breached just like any other contract. We further hold, however, even if the plaintiff in this case could establish the defendant's liability for breach of contract he is limited to reliance damages—a form of recovery he has disavowed and defendant has shown he cannot prove. For this reason we affirm the trial court's judgment for defendant.

## FACTS AND PROCEEDINGS BELOW

The following facts are undisputed.

Baskin Robbins U.S.A. operated an ice cream manufacturing plant in the City of Vernon. When the company announced its intention to close the plant, Kevin A. Copeland expressed an interest in acquiring it. The parties commenced negotiations. Copeland made clear from the outset his agreement to purchase the plant was contingent on Baskin Robbins's agreeing to purchase the ice cream he manufactured there. Copeland testified at his deposition the ice cream purchase arrangement, known as "co-packing," was "critical" and "a key to the deal." Without co-packing, Copeland testified, "this deal doesn't work." Baskin Robbins does not deny the co-packing arrangement was an indispensable part of the contract to purchase the plant.

After several months of negotiations an agreement took shape under which Copeland would purchase the plant's manufacturing assets and sublease the plant property. Baskin Robbins would purchase seven million gallons of ice cream from Copeland over a three-year period.

In May 1999 Baskin Robbins sent Copeland a letter, which stated in relevant part: "This letter details the terms which our Supply Chain executives have approved for subletting and sale of our Vernon manufacturing

facility/equipment and a product supply agreement. . . . (1) Baskin Robbins will sell [Copeland] Vernon's ice cream manufacturing equipment . . . for $1,300,000 cash. . . . (2) Baskin Robbins would agree, subject to a separate co-packing agreement and negotiated pricing, to provide [Copeland] a three year co-packing agreement for 3,000,000 gallons in year 1, 2,000,000 gallons in year 2 and 2,000,000 in year 3. . . . If the above is acceptable please acknowledge by returning a copy of this letter with a non-refundable check for three thousand dollars. . . . We should be able to coordinate a closing [within] thirty days thereafter." Copeland signed a statement at the bottom of the letter agreeing "[t]he above terms are acceptable" and returned the letter to Baskin Robbins along with the $3,000 deposit.

After Copeland accepted the terms in the May 1999 letter, the parties continued negotiating over the terms of the co-packing agreement. Among the issues to be settled were the price Baskin Robbins would pay for the ice cream, the flavors Copeland would produce, quality standards and controls, who would bear the loss from spoilage, and trademark protection. Copeland testified he believed in June 1999 he reached an oral agreement with Baskin Robbins on a price for the ice cream of his cost plus 85 cents per tub. He conceded, however, the parties had not agreed on how the cost component was to be determined and so far as he knew there was no written memorandum of this pricing agreement. None of the other issues were settled before Baskin Robbins allegedly breached the contract.

In July 1999, Baskin Robbins wrote to Copeland breaking off negotiations over the co-packing arrangement and returning his $3,000 deposit. The letter explained Baskin Robbins' parent company had "recently . . . made strategic decisions around the Baskin Robbins business" and "the proposed co-packing arrangement [is] out of alignment with our strategy." Therefore, Baskin Robbins informed Copeland, "we will not be engaging in any further negotiations of a co-packing arrangement."[1] Although Baskin Robbins offered to proceed with the agreement for the sale and lease of the Vernon plant assets it did not insist on doing so, apparently accepting Copeland's view the lack of a co-packing agreement was a "deal-breaker."

In his suit for breach of contract, Copeland alleged he and Baskin Robbins entered into a contract which provided Baskin Robbins would enter into a co-packing agreement with Copeland under the terms set out in the May

---

[1]Copeland submitted evidence showing that notwithstanding its purported change in business strategy Baskin Robbins subsequently entered into co-packing arrangements with other manufacturers to produce the ice cream Copeland would have produced had his transaction been consummated. Because we affirm the judgment on other grounds we need not decide whether this constitutes evidence of bad faith on the part of Baskin Robbins.

1999 letter and additional terms to be negotiated. Baskin-Robbins breached this contract by "unreasonably and wrongfully refusing to enter into any co-packing agreement with [Copeland]." As a result of this breach of contract Copeland suffered expectation damages "in the form of lost profits . . . as well as lost employment opportunities and injury to his reputation." In response to a discovery request, Copeland stated his damages consisted of "lost profits from [the] three year co-packing agreement with defendants" as well as lost profits from other sales he could have made had he acquired the plant and the profit he could have earned from selling the plant equipment. Copeland's discovery responses did not provide or allege he could provide evidence of damages he suffered as a result of his relying on Baskin Robbins' promise to negotiate a co-packing agreement.

The trial court granted Baskin Robbins's motion for summary judgment based on the undisputed facts described, *ante*. The court concluded the May 1999 letter was susceptible to several interpretations but no matter how it was interpreted it failed as a contract because the essential terms of the co-packing deal were never agreed to and there was no reasonable basis upon which to determine them. Copeland filed a timely appeal from the subsequent judgment.

For the reasons discussed, *post*, we affirm the judgment albeit on a ground different from those relied upon by the trial court.

## DISCUSSION

I. *A Cause of Action Will Lie for the Breach of a Contract to Negotiate an Agreement*

When Baskin Robbins refused to continue negotiating the terms of the co-packing agreement Copeland faced a dilemma. "Many millions of dollars" in anticipated profits had melted away like so much banana ripple ice cream on a hot summer day. True enough, he could proceed with the contract for the purchase and lease of the Vernon plant's assets and use those assets to produce ice cream for other retailers. But, as he explained in his deposition, without the Baskin Robbins co-packing agreement he could not afford to purchase the assets and pay the ongoing costs of operating the plant while he searched for other business. Alternatively he could attempt to sue Baskin Robbins for breach of the co-packing agreement on the theory the terms of the agreement set out in the May 1999 letter plus additional terms supplied by the court constituted an enforceable contract. Such a suit, however, had a slim prospect of success. While courts have been increasingly liberal in supplying missing terms in order to find an enforceable contract they do so only where the " 'reasonable intentions of the

parties' " can be ascertained.[2] It is still the general rule that where any of the essential elements of a promise are reserved for the future agreement of both parties, no legal obligation arises "until such future agreement is made."[3] **(1b)** Here, the parties agreed in the May 1999 letter as to the amount of ice cream Baskin Robbins would purchase over a three-year period but, as Copeland candidly admitted, "a variety of complex terms" remained for agreement before the co-packing contract could be completed. These included price, the flavors to be manufactured, quality control standards, and responsibility for waste.

Copeland chose a third course. Rather than insist the parties had formed a co-packing contract and Baskin Robbins had breached it, he claimed the May 1999 letter constituted a contract to negotiate the remaining terms of the co-packing agreement and Baskin Robbins breached this contract by refusing without excuse to continue negotiations or, alternatively, by failing to negotiate in good faith. This path too has its difficulties. No reported California case has held breach of a contract to negotiate an agreement gives rise to a cause of action for damages.[4] On the other hand numerous California cases have expressed the view the law provides no remedy for breach of an "agreement to agree" in the future.[5] We believe, however, these difficulties could be overcome in an appropriate case.

---

[2] *Cal. Lettuce Growers v. Union Sugar Co.* (1955) 45 Cal.2d 474, 481 [289 P.2d 785, 49 A.L.R.2d 496].

[3] *City of Los Angeles v. Superior Court* (1959) 51 Cal.2d 423, 433 [333 P.2d 745]; and see 1 Witkin, Summary of California Law (9th ed. 1987) Contracts, section 156, page 177. Whether a term is "essential" depends on its relative importance to the parties and whether its absence would make enforcing the remainder of the contract unfair to either party. (See *Coleman Engineering Co. v. North American Aviation, Inc.* (1966) 65 Cal.2d 396, 417 [55 Cal.Rptr. 1, 420 P.2d 713]; *City of Los Angeles v. Superior Court, supra,* 51 Cal.2d at p. 433.)

[4] In *Racine & Laramie, Ltd. v. Department of Parks & Recreation* (1992) 11 Cal.App.4th 1026, 1035 [14 Cal.Rptr.2d 335] (*Racine & Laramie*) the court posited, in dictum, such a cause of action could arise where, for example, the parties entered into an agreement they would "bargain in good faith for the purpose of reaching an agreement." In *Auerbach v. Great Western Bank* (1999) 74 Cal.App.4th 1172, 1177, 1190 [88 Cal.Rptr.2d 718], the defendant stipulated its agreement to negotiate with the plaintiffs "concerning the possible modification" of the terms of their loan obligated it "to negotiate in good faith." Therefore, the court concluded, "we have no occasion to consider whether [Great Western]'s promise to engage in negotiations to modify the note is a valid contract as opposed to an unenforceable 'agreement to agree.' " (Citing the dictum in *Racine & Laramie.*) In *Vestar Development II v. General Dynamics Corp.* (9th Cir. 2001) 249 F.3d 958, 960-961, applying California law, the court concluded the question whether an agreement to negotiate a contract is enforceable is "unsettled" but held that in any event plaintiff had failed to allege compensable damages. (See discussion of damages issue, *post.*)

[5] See, e.g., *Autry v. Republic Productions, Inc.* (1947) 30 Cal.2d 144, 151 [180 P.2d 888]; *Beck v. American Health Group Internat., Inc.* (1989) 211 Cal.App.3d 1555, 1563 [260 Cal.Rptr. 237] (*Beck v. American Health Group*).

Initially, we see no reason why in principle the parties could not enter into a valid, enforceable contract to negotiate the terms of a co-packing agreement. A contract, after all, is "an agreement to do or not to do a certain thing."[6] Persons are free to contract to do just about anything that is not illegal or immoral.[7] Conducting negotiations to buy and sell ice cream is neither.

Furthermore, as we will demonstrate below, purported contracts which the courts have dismissed as mere "agreements to agree" are distinguishable from contracts to negotiate in at least two respects.

A contract to negotiate the terms of an agreement is not, in form or substance, an "agreement to agree." If, despite their good faith efforts, the parties fail to reach ultimate agreement on the terms in issue the contract to negotiate is deemed performed and the parties are discharged from their obligations. Failure to agree is not, itself, a breach of the contract to negotiate.[8] A party will be liable only if a failure to reach ultimate agreement resulted from a breach of that party's obligation to negotiate or to negotiate in good faith.[9] For these reasons, criticisms of an "agreement to agree" as "absurd" and a "contradiction in terms"[10] do not apply to a contract to negotiate an agreement.

In addition, it is important to note courts which have found purported contracts to be unenforceable "agreements to agree" have focused on the enforceability of the underlying substantive contract, not on whether the agreement to negotiate the terms of that contract is enforceable in its own right.[11] In *Autry v. Republic Productions Inc.*, for example, after stating the law "provides [no] remedy for breach of an agreement to agree" the court

---

[6]Civil Code section 1549.

[7]Under Civil Code section 1667 persons are not permitted to enter into contracts which are: "1. Contrary to an express provision of law; [¶] 2. Contrary to the policy of express law, though not expressly prohibited; or, [¶] 3. Otherwise contrary to good morals."

[8]*Itek Corporation v. Chicago Aerial Industries, Inc.* (Del. 1968) 248 A.2d 625, 629.

[9]*Itek Corporation v. Chicago Aerial Industries, Inc., supra,* 248 A.2d at page 629; and see Farnsworth, *Precontractual Liability and Preliminary Agreements: Fair Dealing and Failed Negotiations* (1987) 87 Colum. L.Rev. 217, 251. (Hereafter Farnsworth.)

[10]*Avalon Products, Inc. v. Lentini* (1950) 98 Cal.App.2d 177, 180 [219 P.2d 485]. As one early case explained, it is impossible for the law to affix any obligation to a promise to agree " '[s]ince either party by the very terms of the promise may refuse to agree to anything to which the other party will agree[.]' " (*Los Angeles Soda Wks. v. Aquazone Co.* (1930) 103 Cal.App. 105, 108 [284 P. 253].)

[11]See *Vestar Development II v. General Dynamics Corp., supra,* 249 F.3d at page 961.

explained this was so because "[t]he court may not imply what the parties will agree upon."[12]

Our decision in *Beck v. American Health Group* illustrates the distinction between an "agreement to agree" and a contract to negotiate the terms of an agreement.

In *Beck v. American Health Group*, the plaintiff sued the defendant for breach of contract. The alleged contract was contained in a letter to the plaintiff from the defendant's executive director which began: " 'It is a pleasure to draft the outline of our future agreement . . . .' " After outlining the terms of the agreement, the letter concluded: " 'If this is a general understanding of the agreement, I ask that you sign a copy of this letter, so that I might forward it to Corporate Counsel for the drafting of a contract. When we have a draft, we will discuss it and hopefully shall have a completed contract and operating unit in the very near future.' "[13] Noting that " 'preliminary negotiations or an agreement for future negotiations *are not the functional equivalent of a valid, subsisting agreement*' " we concluded the letter "did not constitute a binding contract, but was merely 'an agreement to agree' which cannot be made the basis of a cause of action." We based our conclusion on the words of the letter which "manifest an intention of the parties that no binding contract would come into being until the terms of the letter were embodied in a formal contract to be drafted by corporate counsel."[14]

Assume, however, the defendant in *Beck v. American Health Group* did not present the plaintiff with a draft contract and an opportunity to negotiate its terms as promised in its letter. Instead, the defendant presented the plaintiff with a final contract on a take-it-or-leave-it basis, refusing to negotiate any of the contract terms the plaintiff found unacceptable. Under the law as we see it, the plaintiff could have a cause of action for breach of contract on the theory the letter signed by the parties constituted a contract to negotiate the terms of an agreement and the defendant breached that contract by refusing to negotiate.

---

[12]*Autry v. Republic Productions, Inc., supra*, 30 Cal.2d at pages 151-152.
[13]*Beck v. American Health Group, supra*, 211 Cal.App.3d at page 1559, footnote 1.
[14]*Beck v. American Health Group, supra*, 211 Cal.App.3d at pages 1562-1563.

Most jurisdictions which have considered the question have concluded a cause of action will lie for breach of a contract to negotiate the terms of an agreement.[15]

The *Channel Home Centers* case is illustrative. There the parties executed a letter of intent to enter into the lease of a store in a shopping center. The letter stated, inter alia, Grossman the lessor " 'will withdraw the Store from the rental market, and only negotiate the above described leasing transaction to completion.' " After Channel Home Centers expended approximately $25,000 in activities associated with the negotiations, Grossman unilaterally terminated negotiations. The following day Grossman leased the store to one of Channel Home Centers' competitors, Mr. Good Buys. Channel Home Centers sued Grossman for breach of contract based on the letter of intent. After a court trial, the court awarded judgment to Grossman.[16] The Third Circuit Court of Appeals reversed. Distinguishing this case from one alleging merely the breach of an agreement to agree the court pointed out: "[I]t is Channel's position that [the letter of intent] is enforceable as a mutually binding obligation *to negotiate in good faith.* By unilaterally terminating negotiations with Channel and precipitously entering into a lease agreement with Mr. Good Buys, Channel argues, Grossman acted in bad faith and breached his promise to 'withdraw the Store from the rental market and only negotiate the above-described leasing transaction to completion.' "[17] The court concluded under Pennsylvania law an agreement to negotiate in good faith is an enforceable contract.

■ Baskin Robbins maintains there are sound public policy reasons for not enforcing a contract to negotiate an agreement. In doing so, we would be injecting a covenant of good faith and fair dealing into the negotiation process whether or not the parties specifically agreed to such a term.[18] Citing Professor Farnsworth,[19] Baskin Robbins argues that instead of having a salutary effect on contract negotiations, imposing a regime of good faith and fair dealing would actually discourage parties from entering into negotiations, especially where the chances of success were slight. Alternatively,

---

[15]*Channel Home Centers, Grace Retail v. Grossman* (3d Cir. 1986) 795 F.2d 291, 293-294, 299; see also *Venture Associates v. Zenith Data Systems* (7th Cir. 1993) 987 F.2d 429, 433 (applying Illinois law); *Am. Broadcasting Companies v. Wolf* (1981) 52 N.Y.2d 394 [438 N.Y.S.2d 482, 484, 420 N.E.2d 363, 365]; *Itek Corporation v. Chicago Aerial Industries, Inc.,* *supra,* 248 A.2d at page 629.

[16]*Channel Home Centers, Grace Retail v. Grossman, supra,* 795 F.2d at pages 293-296.

[17]*Channel Home Centers, Grace Retail v. Grossman, supra,* 795 F.2d at pages 298-299, footnote omitted.

[18]In California, a covenant of good faith and fair dealing is implied in every contract. (*Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654, 684 [254 Cal.Rptr. 211, 765 P.2d 373].)

[19]See footnote 9, *ante.*

such an obligation might increase the pressure on the parties to bring the negotiations to a hasty, even if unsatisfactory conclusion, rather than risk being charged with the ill-defined wrong of bad faith negotiation. Most parties, Baskin Robbins suggests, would prefer to risk losing their out-of-pocket costs if the negotiation fails rather than risk losing perhaps millions of dollars in expectation damages if their disappointed negotiating partner can prove bad faith. Finally, Baskin Robbins argues, any precontractual wrongdoing can be adequately remedied by existing causes of action for unjust enrichment, promissory fraud and promissory estoppel.

We find Baskin Robbins's policy arguments unpersuasive.

Allowing a party to sue for breach of a contract to negotiate an agreement would not inject a covenant of good faith and fair dealing into the negotiation process in violation of the parties' intent. When two parties, under no compulsion to do so, engage in negotiations to form or modify a contract neither party has any obligation to continue negotiating or to negotiate in good faith.[20] Only when the parties are under a contractual compulsion to negotiate does the covenant of good faith and fair dealing attach, as it does in every contract.[21] In the latter situation the implied covenant of good faith and fair dealing has the salutary effect of creating a disincentive for acting in bad faith in contract negotiations.

Professor Farnsworth's criticisms were not directed toward a cause of action for breach of a contract to negotiate the terms of an agreement. On the contrary, Farnsworth supports such a cause of action.[22] Rather, his criticisms were directed at the theory propounded by some European courts and legal scholars that, even absent a contractual agreement to negotiate, a general obligation of fair dealing arises out of the negotiations themselves.[23] We rejected this theory of liability in *Los Angeles Equestrian Center, Inc. v. City of Los Angeles*,[24] as did the court in *Racine & Laramie*.[25]

■ Arguing bad faith is an uncertain concept which could cost the defendant millions of dollars in expectation damages is also without merit. For the reasons we explain below, the appropriate remedy for breach of a contract to negotiate is not damages for the injured party's lost expectations

---

[20]*Los Angeles Equestrian Center, Inc. v. City of Los Angeles* (1993) 17 Cal.App.4th 432, 447 [21 Cal.Rptr.2d 313]; *Racine & Laramie, supra,* 11 Cal.App.4th at pages 1032-1033.

[21]*Foley v. Interactive Data Corp., supra,* 47 Cal.3d at page 684.

[22]Farnsworth, *supra,* 87 Colum. L.Rev. at pages 251, 263-269.

[23]Farnsworth, *supra,* 87 Colum. L.Rev. at pages 239-243.

[24]*Los Angeles Equestrian Center, Inc. v. City of Los Angeles, supra,* 17 Cal.App.4th at page 447.

[25]*Racine & Laramie, supra,* 11 Cal.App.4th at pages 1032-1033.

under the prospective contract but damages caused by the injured party's reliance on the agreement to negotiate.[26] Furthermore, we disagree with those who say the courts, unlike the National Labor Relations Board or labor arbitrators, are ill equipped to determine whether people are negotiating with each other in good faith.[27] While few of us will ever negotiate a multimillion-dollar contract, each of us participates in some form of negotiation nearly every day. In most cases the question whether the defendant negotiated in good faith will be a question of fact for the jury. In our view ordinary citizens applying their experience and common sense are very well equipped to determine whether the parties negotiated with each other in good faith.

Recovery for unjust enrichment in the context of contract negotiations is usually based on ideas disclosed or services rendered during the negotiations.[28] Where, as here, the negotiations are over the sale of goods, the subject matter of the contract is not an idea nor does the potential seller typically confer a precontractual service on the potential buyer.

A cause of action for promissory fraud is based on "[a] promise made without any intention of performing it."[29] In many cases the defendant may have intended to negotiate in good faith when it contracted to do so but changed its mind later when, for example, a more attractive contracting partner came along.[30]

Thus, we conclude neither unjust enrichment nor promissory fraud provides a party an adequate vehicle for relief when its negotiating partner breaks off negotiations or negotiates in bad faith.

The doctrine of promissory estoppel is generally used to enforce the defendant's clear and unambiguous promise when the plaintiff has reasonably and foreseeably relied on it.[31] We agree a cause of action for promissory estoppel might lie if the defendant made a clear, unambiguous promise to negotiate in good faith and the plaintiff reasonably and foreseeably relied

---

[26]See Farnsworth, *supra*, 87 Colum. L.Rev. at page 267.

[27]See, e.g., *Venture Associates v. Zenith Data Systems* (7th Cir. 1996) 96 F.3d 275, 277. (*Venture Associates II.*)

[28]See, e.g., *Blaustein v. Burton* (1970) 9 Cal.App.3d 161, 184 [88 Cal.Rptr. 319] (idea for motion picture disclosed to defendants in discussing production contract); *Hill v. Waxberg* (9th Cir. 1956) 237 F.2d 936, 938-939 (services of architect rendered to contractor during negotiation for building contract).

[29]Civil Code section 1572 subdivision 4; *Muraoka v. Budget Rent-A-Car Inc.* (1984) 160 Cal.App.3d 107, 119 [206 Cal.Rptr. 476].

[30]See *Channel Home Centers, Grace Retail v. Grossman*, *supra*, 795 F.2d at page 296, discussed *ante*, at pages 1258-1259.

[31]*Laks v. Coast Fed. Sav. & Loan Assn.* (1976) 60 Cal.App.3d 885, 890 [131 Cal.Rptr. 836].

on that promise in incurring expenditures connected with the negotiation.[32] We may also assume for the sake of argument such a cause of action could be based on an implied promise to negotiate in good faith.[33] If these propositions are correct, then promissory estoppel is just a different rubric for determining the enforceability of a contract to negotiate an agreement.[34]

Finally, we believe there are sound public policy reasons for protecting parties to a business negotiation from bad faith practices by their negotiating partners. Gone are the days when our ancestors sat around a fire and bargained for the exchange of stone axes for bear hides. Today the stakes are much higher and negotiations are much more complex. Deals are rarely made in a single negotiating session. Rather, they are the product of a gradual process in which agreements are reached piecemeal on a variety of issues in a series of face-to-face meetings, telephone calls, e-mails and letters involving corporate officers, lawyers, bankers, accountants, architects, engineers and others.[35] As Professor Farnsworth observes, contracts today are not formed by discrete offers, counteroffers and acceptances. Instead they result from a gradual flow of information between the parties followed by a series of compromises and tentative agreements on major points which are finally refined into contract terms.[36] These slow contracts are not only time-consuming but costly. For these reasons, the parties should have some assurance "their investments in time and money and effort will not be wiped out by the other party's footdragging or change of heart or taking advantage of a vulnerable position created by the negotiation."[37] This concept is not new to California law. In *Drennan v. Star Paving Co.* the court applied the doctrine of promissory estoppel to hold that where a general contractor used the bid of a subcontractor in formulating its own successful bid for a job the court would imply a promise by the subcontractor not to revoke its bid in order "to preclude the injustice that would result if the offer could be revoked after the offeree had acted in detrimental reliance thereon."[38]

For obvious reasons, damages for breach of a contract to negotiate an agreement are measured by the injury the plaintiff suffered in relying on the

---

[32]See *Arcadian Phosphates, Inc. v. Arcadian Corp.* (2d Cir. 1989) 884 F.2d 69, 74.

[33]See *Drennan v. Star Paving Co.* (1958) 51 Cal.2d 409 [333 P.2d 757], discussed, *post.*

[34]See *Venture Associates II, supra,* 96 F.3d at page 277.

[35]See Farnsworth, *supra,* 87 Colum. L.Rev. at pages 218-219.

[36]Farnsworth, *supra,* 87 Colum. L.Rev. at page 219.

[37]*Venture Associates II, supra,* 96 F.3d at page 278; and see *Channel Home Centers* discussed, *ante,* at pages 1258-1259.

[38]*Drennan v. Star Paving Co., supra,* 51 Cal.2d at page 414.

defendant to negotiate in good faith. This measure encompasses the plaintiff's out-of-pocket costs in conducting the negotiations[39] and may or may not include lost opportunity costs.[40] The plaintiff cannot recover for lost expectations (profits) because there is no way of knowing what the ultimate terms of the agreement would have been or even if there would have been an ultimate agreement.[41]

II. *Baskin Robbins Is Entitled to Summary Judgment Because It Has Shown Copeland Cannot Establish Reliance Damages.*

■ A defendant is entitled to summary judgment if it "show[s] that one or more elements of the cause of action . . . cannot be established" by the plaintiff.[42] The defendant may not make this showing through argument alone but may do so through the plaintiff's discovery responses if those responses demonstrate "the plaintiff does not possess, and cannot reasonably obtain, needed evidence" to establish his cause of action.[43]

■ As we explained in part I, *ante*, reliance damages are the only form of recovery available in an action on a contract to negotiate an agreement. Baskin Robbins has shown through Copeland's complaint and discovery responses he cannot establish reliance damages.[44]

The only damages Copeland seeks in his complaint are derived from what he would have received if the underlying contract had been consummated, e.g., the profits he hoped to earn through the co-packing agreement and other ice cream sales. Satisfactory proof of such damages is impossible because there is no way to know what the eventual terms of the co-packing agreement would have been, or even if the parties would have reached an agreement.[45] Copeland's complaint disavowed reliance damages, e.g., time spent, expenses incurred, opportunities missed while negotiating with Baskin Robbins.

---

[39]*Auerbach v. Great Western Bank, supra,* 74 Cal.App.4th at page 1191; and see *Venture Associates II, supra,* 96 F.3d at page 278, *Arcadian Phosphates, Inc. v. Arcadian Corp., supra,* 884 F.2d at pages 73-74 and footnote 2.

[40]Farnsworth, *supra,* 87 Colum. L.Rev. at pages 225-229. Because Copeland cannot establish lost opportunity costs in this case we need not decide whether, in principle, such damages are recoverable for breach of a contract to negotiate. See discussion, *post.*

[41]*Auerbach v. Great Western Bank, supra,* 74 Cal.App.4th at pages 1191-1192; *Vestar Development II v. General Dynamics Corp., supra,* 249 F.3d at pages 961-962; *Venture Associates II, supra,* 96 F.3d at pages 278-279 & 280-281 (conc. opn.); Farnsworth, *supra,* 87 Colum. L.Rev. at page 263.

[42]Code of Civil Procedure section 437c, subdivision (o)(2).

[43]*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 855 [107 Cal.Rptr.2d 841, 24 P.3d 493].

[44]Code of Civil Procedure section 437c, subdivisions (b), (o)(2).

[45]*Auerbach v. Great Western Bank, supra,* 74 Cal.App.4th at pages 1191-1192; *Vestar Development II v. General Dynamics Corp., supra,* 249 F.3d at page 962.

More importantly, in response to interrogatories from Baskin Robbins, Copeland stated his damages were his lost profits from the ice cream deals and the profit he could have made from selling the plant equipment. We conclude the allegations in Copeland's complaint together with his discovery responses constitute a sufficient showing Copeland "does not possess, and cannot reasonably obtain, needed evidence" to establish reliance damages and, therefore, Baskin Robbins was entitled to summary judgment.[46]

## DISPOSITION

The judgment is affirmed.

Woods, J., and Perluss, J., concurred.

---

[46]Compare *Vestar Development II v. General Dynamics Corp., supra,* 249 F.3d at pages 961-962, in which the court held even if the plaintiff could otherwise state a cause of action for breach of a contract to negotiate an agreement the complaint was properly dismissed because the plaintiff alleged only "speculative" lost profits and "expressly disavowed" reliance damages.