Filed 12/18/13  Adams v. JP Morgan Chase Bank CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| CHARLES ADAMS III,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>JP MORGAN CHASE BANK, N.A. et al.,<br><br>    Defendants and Respondents. | B245892<br><br>(Los Angeles County<br>Super. Ct. No. SC114600) |

APPEAL from a judgment of the Superior Court of Los Angeles County. H. Chester Horn, Jr., Judge.  Affirmed.

Sidley Law Group and Michael I. Sidley for Plaintiff and Appellant.

Wargo & French, Mark Block, Shanon J. McGinnis and Jeffrey N. Williams for Defendants and Respondents, JP Morgan Chase Bank, N.A., California Reconveyance Company and Bank of America, N.A.

_____

Charles Adams III sued JP Morgan Chase Bank, N.A. (Chase), Bank of America, N.A. (BAC), and California Reconveyance Company (CRC) on claims arising from his failed attempts to negotiate a loan modification. The defendants filed a joint demurrer to Adams's operative third amended complaint (TAC). The trial court sustained the defendants' demurrer and entered a judgment of dismissal. Adams appeals and we affirm.

## FACTS

As always in the context of reviewing a demurrer, we consider the facts alleged in the operative complaint to be true. (*Moore v. Regents of University of California* (1990) 51 Cal.3d 120, 125.) We may also consider matters that are judicially noticed. (*Serrano v. Priest* (1971) 5 Cal.3d 584, 591.) Examined in light of these rules, the following are the facts in this case.

In December 2006, Adams financed the purchase of real property on Pacific Coast Highway in Malibu with a loan from Washington Mutual Bank (WaMu).[1] As part of the loan agreement Adams signed a note stating he owed $1.14 million to WaMu; payment of the note was secured by a deed of trust. The deed of trust identified WaMu as both the lender and beneficiary, and CRC as the trustee. For a period of time, WaMu serviced the loan by collecting payments on Adams's note.

Subsequent to making the Adams loan, WaMu became insolvent, and the FDIC was appointed as receiver for WaMu. In 2008, the FDIC, as WaMu's receiver, entered into a Purchase and Assumption Agreement transferring all interest in WaMu's assets to Chase. In summary, by 2008 Chase had succeeded to WaMu's interests in the Adams

---

[1] In his original complaint, Adams alleged he purchased the Malibu property in December *2006*. We use this date. In subsequent pleadings, including his operative TAC, and in his opening brief on appeal, the loan date is stated as December *2008*, but this cannot be correct. The record contains materials showing that WaMu had become insolvent and had been taken over by the Federal Deposit Insurance Corporation (FDIC) before December 2008. WaMu could not have made a loan to Adams in December 2008. Also, copies of loan documents that Adams attached as exhibits to his original complaint show that he obtained his loan in December 2006, as he alleged in his original complaint.

2

loan, as beneficiary under the deed of trust securing payment of the loan, and as the servicer of Adams's loan.

"Prior to, but within the past two years [before] July 6, 2011, [Adams] entered into an oral contract *with . . . Chase* for the purpose of obtaining a loan modification with . . . Chase and/or . . . BAC."[2]  (Italics added.)  The oral contract entered into between Adams and Chase provided that Chase and BAC "would work with [Adams] in good faith to reach a loan modification, but [Adams] first had to permit his loan to fall into default."[3] (Italics added.)  In papers he later filed in the trial court, Adams expressly acknowledged that he was not alleging "a contract 'obligating [Chase and or BAC] to modify [his Chase] loan.'"  As such, we understand Adams to have attempted to allege an oral "contract to negotiate" for a loan modification.  In summary, Adams alleged a breach of an oral contract *to engage in a process* — i.e., "to negotiate in good faith."

Chase and BAC breached the oral contract entered into between Chase and Adams "by . . . failing to negotiate a loan modification in good faith, in that they frustrated [his] attempts at every step . . . so that no loan modification was ever entered into between the parties."[4]  Adams performed all obligations and satisfied all conditions for which he was responsible under the oral contract to negotiate.  We understand this allegation to mean that Adams permitted his original Chase (nee WaMu) loan to go into default.  Chase and

---

**2**  Adams's pleadings do not identify who at Chase entered into the alleged oral contract with him and do not allege facts showing the person's authority to enter into such a contract.  No specific dates are alleged as to when the oral contract was made.

**3**  Adams's pleadings do not allege facts explaining how any one at Chase could bind any one at BAC to negotiate with him for a modification of his Chase (nee WaMu) loan.

**4**  No specific "frustrating act" is alleged in the body of Adams's TAC.  He attached a dozen or so pages of documents (from an unidentified source) memorializing a series of communications with Chase-related personnel between June 2010 and September 2011. The communications include statements to the following effects:  need updated financial information; need new application to be filed; person working on loan is not available; file is under review by underwriter; file being reviewed by management.  Adams's pleading does not allege facts showing any act or statement by any person from BAC constituting a breach of the oral contract he alleged in his TAC.

3

BAC's breach of the oral contract to negotiate "caused [Adams] to incur additional and substantial expenses because the entry . . . of the notice of default caused [his] credit and borrowing expenses to increase substantially, and in some instances prevented him from securing credit." No specific instance of increased borrowing expenses is alleged.[5]

In July 2011, Chase assigned the beneficial interest under the deed of trust to BAC, but Chase continued servicing the Adams loan. At about the same time, CRC (the trustee under the deed of trust) recorded a notice of default against the Malibu property stating that Adams had fallen behind on his loan payments by more than $60,000. On October 11, 2011, CRC recorded a notice against the Malibu property that the trustee's sale was set for November 3, 2011.

On October 24, 2011, Adams commenced his current action by filing a complaint to halt the pending foreclosure sale. In August 2012, Adams filed his operative TAC. The TAC alleged the following causes of action, listed respectively: breach of oral contract; breach of the implied covenant of good faith and fair dealing, apparently as a contract based claim; negligent interference with prospective economic relations; and violation of the Unfair Competition Law or UCL (see Bus. & Prof. Code, § 17200). Adams prayed for compensatory damages, attorney fees under the UCL, injunctive relief "prohibiting any further action by the defendants under the notice of default [and notice of sale recorded] and [Adams]'s property," and injunctive relief respecting the "rights of the general public." The named defendants were Chase, BAC, and CRC.[6]

All of the causes of action in Adams's operative TAC are based on the allegations noted above that at some unidentified point in time within the past two years prior to July 2011 (the date the notice of default was recorded), Adams entered an oral contract with Chase for purposes of obtaining a loan modification with Chase and/or BAC, and that the

---

[5] As alleged in his TAC, it was Adams's decision to allow his loan to go into default that caused the credit problems.

[6] It appears that CRC was named as a defendant solely because it would conduct the foreclosure sale. No contractual promise or breach or any wrongful act (or any act at all) is alleged as to CRC.

4

contract provided Chase and BAC "would work with [Adams] in good faith, to reach a loan modification, but [Adams] first had to permit his loan to fall into default." Adams alleged a breach in that Chase and BAC had "failed to negotiate with him in good faith toward a loan modification."

Chase, BAC and CRC filed a joint demurrer to Adams's TAC. On October 17, 2012, the parties argued the matter to the trial court, and the court took the matter under submission. Later that same day, the court issued an order sustaining the demurrer without leave to amend. On November 1, 2012, the court signed and entered judgment of dismissal in favor of Chase, BAC and CRC.

Adams filed a timely notice of appeal.

## DISCUSSION

### I. Standard of Review

A demurrer tests whether a pleading is legally sufficient to state a cause of action. (*Hernandez v. City of Pomona* (1996) 49 Cal.App.4th 1492, 1497.) Our task on appeal is to determine whether the alleged facts are sufficient to state a cause of action. (*McCall v. PacifiCare of Cal., Inc.* (2001) 25 Cal.4th 412, 415.) Our review is de novo, meaning we independently decide whether the complaint is legally sufficient to state a cause of action. (*Wilner v. Sunset Life Ins. Co.* (2000) 78 Cal.App.4th 952, 958.)

An appellate court reviews a trial court's ruling, not its stated reasons for its ruling. Thus, a trial court's ruling that is correct under any legal principle raised in the trial court will not be disturbed on appeal on the ground the ruling was rendered for a "wrong" reason. When the trial court issues a ruling that is correct on any theory of law applicable to the case and raised in the trial court, its ruling will be affirmed on appeal regardless of the considerations that moved the trial court to its conclusion. (*Schabarum v. California Legislature* (1998) 60 Cal.App.4th 1205, 1217.)

5

## II. The Contract-Related Causes of Action

The joint demurrer filed by Chase, BAC and CRC (hereafter collectively Chase) argued that Adams's alleged contract-related causes of action were barred by the statute of frauds. The trial court agreed, as do we.[7]

Adams's TAC expressly alleged that the oral contract he entered into with Chase was entered into "for the purpose of obtaining a loan modification." This necessarily means a modification of the original loan agreement, including the note secured by the deed of trust, through which Adams financed the purchase of the Pacific Coast Highway property. We read nothing in Adams's briefs on appeal or in his submissions in the trial court to raise a dispute that long term loan agreements which include an interest in real property (e.g., a deed of trust) are invalid unless memorialized in writing under the statute of frauds. (See Civ. Code, § 1624.) And, an agreement to modify an agreement that is subject to the statute of frauds is also subject to the statute of frauds. (*Secrest v. Security National Mortgage Loan Trust 2002-2* (2008) 167 Cal.App.4th 544, 553 [an agreement by a lender to forbear from exercising a right of foreclosure under a deed of trust was an attempted modification of a contract subject to statute of frauds, and, therefore, was also subject to statute of frauds].) "Here, the alleged promise for a loan modification is subject to the statute of frauds. Absent a written agreement to modify the loan, any claim based upon an oral contract to modify the loan is barred by the statute of frauds." (*Clark v. Countrywide Home Loans, Inc*. (E.D. Cal. 2010) 732 F.Supp.2d 1038, 1043-1044.)

---

[7] The trial court's minute order on Chase's demurrer refers to the "statute of limitations argument" presented in the demurrer. The court plainly mistyped "statute of limitations" when it intended to type "statute of frauds." Chase did not make a statute of limitations argument in its demurrer. Also, the minute order's language immediately following the statute of "limitations" reference discusses how Adams did not respond to Chase's statute of "frauds" argument. To the extent Adams's opening brief on appeal questions the trial court's ruling on the "statute of limitations," we see no need to address the argument; the statute of limitations is not a legal issue we need to review.

6

To avoid this result, Adams presents a two-part argument. First, he argues he is not alleging an oral agreement with his lender for a loan modification, but rather, an oral agreement with his lender to engage in a *process*, i.e., to negotiate in good faith for a loan agreement. He argues such a "contract to negotiate" is a recognized, enforceable contract under California law, and that a "contract to negotiate" is breached by a party's failure to perform the contractual obligation to negotiate in good faith. Adams's argument is based on *Copeland v. Baskin Robbins U.S.A.* (2002) 96 Cal.App.4th 1251 (*Copeland*), decided in the context of a motion for summary judgment. Building upon this foundation, Adams next argues that a "contract to negotiate" such as he alleges is not subject to the statute of frauds. He relies on *Shell v. Darneille* (1984) 162 Cal.App.3d 957 (*Shell*) for this second part of his argument. We address both parts of Adams's argument in order.

*1. Enforceable "Contracts to Negotiate"*

*Copeland* involved a prospective sale of an ice cream manufacturing plant. (*Copeland, supra,* 96 Cal.App.4th at pp. 1253-1254.) During negotiations, prospective buyer Copeland, "made clear" to prospective seller Baskin Robbins, that he would not close the purchase of the plant unless Baskin Robbins agreed to buy ice cream produced by Copeland at the plant for a period of three years after the sale (in the parties' verbiage, a "co-packing" agreement). (*Ibid.*) The parties signed a letter agreement which stated that Baskin Robbins would sell its ice cream plant to Copeland for $1.3 million, *and* Baskin Robbins "would agree, *subject to a separate co-packing agreement and negotiated pricing,*" to provide Copeland a three year co-packing agreement for 3 million gallons in year one, then 2 million gallons in years two and three. (*Id.* at p. 1254.) After several months of negotiation over the terms of the contemplated co-packing agreement, Baskin Robbins pulled out of negotiations for the co-packing agreement, and indicated that it would or would not go forward with the sale of the plant, at Copeland's choosing, apparently accepting Copeland's view that the lack of a further co-packing agreement was a "'deal-breaker.'" (*Ibid.*)

7

Copeland sued Baskin Robbins for *breach of the letter agreement that the parties had signed*, alleging that Baskin Robbins had wrongly refused to negotiate the further co-packing agreement that the parties had contemplated under the letter agreement. (*Copeland, supra,* 96 Cal.App.4th at pp. 1254-1255.) The trial court granted Baskin Robbins's motion for summary judgment, finding that the parties' letter agreement "failed as a contract" because the parties never agreed on the essential terms of the further, contemplated co-packing agreement. (*Id.* at p. 1255.)

The Court of Appeal affirmed summary judgment on other grounds. In so doing, it ruled that a provision in a contract calling upon the parties to negotiate a further agreement is distinguishable from an unenforceable "'agreement to agree.'" It determined that a contract with a provision to negotiate further "can be formed and breached just like any other contract." (*Copeland, supra,* 96 Cal.App.4th at pp. 1253, 1257-1263.) The Court of Appeal likened Copeland's claims to those in *Channel Home Centers, Grace Retail v. Grossman* (3d Cir. 1986) 795 F.2d 291 (*Channel Home*) where two parties entered into a preliminary written agreement for a lease of a store in a shopping center, with a term providing that they would negotiate further terms before finalization of all of the lease terms, and the lessor thereafter withdrew from the preliminary agreement and leased the store to a third party. In *Channel Home*, the Third Circuit Court of Appeals ruled that, by unilaterally terminating negotiations, the lesser had breached the "we agree to negotiate" term in the parties' preliminary written agreement. (*Copeland, supra,* at p. 1259.)

Adams' current case is different, as he has not alleged an underlying, concrete preliminary agreement with Chase with a term providing that the parties would negotiate further to finalize all terms of a contemplated final agreement. He has essentially tried to skip a step. In so doing, Adams has alleged a more direct and unenforceable "agreement to agree." (See, e.g., *Roberts v. Adams* (1958) 164 Cal.App.2d 312, 316; *Coleman Engineering Co. v. North American Aviation, Inc*. (1966) 65 Cal.2d 396 [an "agreement to agree" is not enforceable unless the terms left to future negotiation are of a minor nature compared to an underlying agreement].) Adams has cited us no case in which a

8

court found an enforceable promise to negotiate in the absence of some *well-defined underlying agreement*. Adams's arguments do not persuade us that he has sufficiently alleged a type of agreement that would qualify as an enforceable "contract to negotiate" under *Copeland*.

  2.  *The Statute of Frauds*

  Even if Adams has alleged a recognized, enforceable style of a "contract to negotiate," the statute of frauds still would be applicable in the factual context of his case. Adams's reliance on *Shell, supra,* 162 Cal.App.3d 957 for a different result is not persuasive. In *Shell*, the plaintiff worked as an oil industry lobbyist. He alleged and proved at trial that the defendant *owed him compensation* under a contract that could be called an employment or agency agreement. The defendant hired the plaintiff to negotiate a lease modification with a third party on the defendant's behalf after the business relationship between the defendant and the third party deteriorated. In other words, there was a lease agreement between the defendant and a third party, and the defendant hired the plaintiff to assist the defendant get a lease modification, but the plaintiff did not enter any agreement directly linked to the lease. (*Id*. at p. 961.) In this context, the Court of Appeal ruled that the agreement between the plaintiff and defendant, was basically an agreement to hire an agent to lead negotiations, and that such an agreement was not subject to the statute of frauds even though a lease modification was the contemplated end result of their relationship. This was so because the agreement involved in the case was not to modify a property-related agreement; the lease holder was not a party to the "I will help you get a modification" agreement. The case was based on the plaintiff's agency contract with the defendant; the lease was a side matter.

  Adams's current case is different because he alleged a direct oral agreement with his lender, Chase. The original loan agreement entered into between Chase and Adams had to be in writing and, thus, so too did the alleged oral agreement concerning modification. This is so whether we view the alleged agreement as an alleged direct agreement for a loan modification or an alleged agreement to negotiate a modification. In either event, the intended end result between the original contracting parties was a

9

modification or attempted modification of an agreement that had to be in writing. Adams did not hire someone to assist him in obtaining a loan modification, and is not suing that agent for failure to do his or her job, nor is the agent suing to be paid for work performed. (See *Shell, supra,* 162 Cal.App.3d 957.) To allow a claim for breach of an oral "contract to negotiate" such as that which is alleged in Adams's current case, free from the statute of frauds, would allow a breach of contract action to arise, free from the statute of frauds, in every instance in which a borrower could not obtain a loan modification. We disagree that such a result should come to pass from *Copeland, supra,* 96 Cal.App.4th 1251 and *Shell, supra,* 162 Cal.App.3d 957.

## III.    Prospective Economic Relations

Adams contends he alleged sufficient facts to state a cause of action for negligent interference with prospective economic relations. We disagree.

To state a cause of action for the tort of negligent interference with prospective economic relations, a plaintiff must allege (1) an economic relationship existed between the plaintiff and a third party with a reasonably probable future economic benefit for the plaintiff; (2) the defendant knew of the existence of the relationship and knew or should have known that if the defendant did not act with due care its actions would interfere with the relationship and cause plaintiff to lose in whole or in part the reasonably probable future economic benefit of the relationship; (3) the defendant was negligently interfered with the relationship; and (4) the defendant's negligence caused damage to plaintiff in that the relationship was actually interfered with or disrupted and plaintiff lost in whole or in part the economic benefits reasonably expected from the relationship. (See *North American Chemical Co. v. Superior Court* (1997) 59 Cal.App.4th 764, 786.) Of course, the tort arises in the context of negligence, meaning it arises only when the plaintiff pleads the defendant owed the plaintiff a duty of care. (*LiMandri v. Judkins* (1997) 52 Cal.App.4th 326, 348.) The plaintiff also has the burden of pleading the defendant's interference was wrongful beyond the fact of the interference itself. (See *Della Penna v. Toyota Motor Sales, U.S.A.*, Inc. (1995) 11 Cal.4th 376, 393.) It is not enough merely to

10

allege an act that causes interference; plaintiff must allege the act was wrongful, which, in Adams's current case, means a negligent act.

The trial court correctly sustained the defendants' demurrer for several reasons. First, Adams's TAC did not allege that an identifiable economic relationship existed between him and a third party with a reasonably probable future economic benefit for Adams. His TAC merely alleges in the baldest of conclusory language that he "enjoyed an economic, and profitable, relationship with others that probably would have resulted in a future economic benefit to him." Basically, he alleges his credit-worthiness was diminished. But he does not allege facts showing that any actual credit relationship was adversely affected. In the absence of alleged facts as to a relationship that suffered from some manner of interference, we affirm the trial court's ruling.

Second, as the trial court correctly noted, Adams' cause of action for negligent interference with prospective economic relations also fails because it is based upon his allegation that defendants engaged in negligent conduct by failing and refusing to negotiate for a loan modification. That is, a reiteration of his alleged breach of oral contract claim. Adams did not allege wrongful conduct "beyond the fact of the interference itself" in that the alleged interference was the failure to make a loan, which was the alleged wrongful conduct causing the interference. Adams's TAC is as circular as it is conclusory. He does not allege facts showing a duty of care was owed underlying the failure to negotiate.

Adams reliance on *Wallis v. Superior Court* (1984) 160 Cal.App.3d 1109 (*Wallis*) for a different conclusion is not persuasive. Adams tells us in his opening brief on appeal that *Wallis* supports the principle that "where contract damages alone do not remedy the harm suffered, California law will recognize a tort claim based upon a breach of contract." We find *Wallis* is completely out of place to the issue of pleading a cause of action for negligent interference with prospective economic relations. *Wallis* involved a non-competition agreement between employee and employer, and retirement benefits. Even assuming *Wallis* is still good law (but see *Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654 [employee-employer relationships are not like insurer-insured

11

relationships]), the case supports the proposition that parties in certain special contractual circumstances may allege a breach of the covenant of good faith and fair dealing as a tort. Even if *Wallis* said what Adams says it says — that California law recognizes tort claims based on a breach of contract — a plaintiff does not allege a cause of action sounding in tort merely by the alternative labeling of a breach of contract cause of action as a tort cause of action. A plaintiff must still allege a special relationship in order to be sufficient to state a tort cause of action. Here, Adams has not done so; he merely re-pled his breach of contract with a the new tort label of negligent interference with prospective economic relations.

## IV.    The UCL

Adams contends he alleged sufficient facts to state a cause of action for violation of the UCL. We disagree.

The UCL defines "unfair competition" as "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." (Bus. & Prof. Code, § 17200.) In proscribing "unlawful" business acts or practices, the UCL "borrows" from other statutory laws and makes violations of such laws independently actionable. (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co*. (1999) 20 Cal.4th 163, 180.)

Adams does not allege any violation of any statutory law. We acknowledge that a business act or practice may be independently actionable under the UCL apart from a statutory violation in that "any . . . unfair or fraudulent business act or practice" may alternatively support relief under the UCL. Here, Adams's TAC alleges a breach of an oral contract. Although a breach of contract claim may form the predicate for a UCL claim, the breach must also constitute an unfair or fraudulent practice. (*Arce v. Kaiser Foundation Health Plan, Inc*. (2010) 181 Cal.App.4th 471, 489-490.) Thus, our state's courts have recognized that the "'systematic breach of certain types of contracts,'" for example, a company's breaches of standard consumer contracts, "'can constitute an unfair business practice under the UCL. [Citations.]'" (*Ibid*.) However, Adams's TAC does not allege facts showing acts or practices of such a nature. He has incorporated his

12

alleged breach of oral contract claim, and added a conclusory allegation, based on information and belief, that "defendants engage in the same, or similar, unfair actions and inactions, against members of the public similarly situated as plaintiff." We find this insufficient.

## V. Leave to Amend

Adams contends the trial court abused its discretion in declining to grant him leave to file a fourth amended complaint. We disagree.

The trial court's decision denying leave to amend upon sustaining a demurrer is reviewed for abuse of discretion. (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.) When a plaintiff and appellant shows that he or she can cure defects in a pleading by an amendment, the trial court has abused its discretion, and an appellate court will reverse; if not, there has been no abuse of discretion and the appellate court will affirm. (*Ibid*.) The burden of showing such reasonable probability is squarely on the plaintiff and appellant. (*Ibid*.)

In the trial court, Adams did not proffer any proposed amended pleading in his opposition to the demurrer to his TAC. Instead, he stood pat on his arguments that he had sufficiently pleaded all of his causes of action in his TAC. On appeal, Adams argues "it would be reasonable to allow amendments" to cure any defects in his TAC given that he had retained new counsel shortly before he filed his opposition to the demurrer to his TAC, and his new counsel "was not involved with any of the prior amendments." Adams has not, however, proffered on appeal any proposed amending language or an amended pleading.

Because Adams did not show in the trial court, and has not shown on appeal, how he can cure his pleading by amendment, he has not demonstrated an abuse of discretion. His *assertion* in his opening brief on appeal that he "can amend his complaint to plead exceptions to the statute of frauds, to more specifically identify the economic relations Defendants interfered with, or to provide more detail concerning Defendants' unfair business practices" is not a sufficient substitute for showing — by actually proffering amended allegations — how the defects in his operative complaint can be cured.

## DISPOSITION

The judgment is affirmed.  Each party to bear its own costs on appeal.


BIGELOW, P. J.

We concur:


FLIER, J.


GRIMES, J.