# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| BEAUTYCON MEDIA ABC TRUST, ACTING THROUGH SACCULLO BUSINESS CONSULTING, LLC, IN ITS CAPACITY AS TRUSTEE OF THE TRUST AND ASSIGNEE FOR THE BENEFIT OF CREDITORS OF ASSIGNOR BEAUTYCON MEDIA, INC., | ) ) ) ) ) ) ) ) ) ) | C.A. No. N22C-12-143 MAA CCLD |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| NEW GENERAL MARKET PARTNERS, LLC, | ) ) ) | |
| Defendant. | ) ) | |

Submitted: May 16, 2023
Decided: August 11, 2023

*Upon Defendants' Motion to Dismiss:*
**GRANTED in part and DENIED in part.**

## <u>MEMORANDUM OPINION</u>

Kevin M. Capuzzi, Esquire (Argued), of BENESCH, FRIEDLANDER, COPLAN & ARONOFF, LLP, Wilmington, Delaware, Attorney for Plaintiff.

Paul D. Brown, Esquire, and Mark L. Desgrosseilliers, Esquire, of CHIPMAN BROWN CICERO & COLE, LLP, Wilmington, Delaware, and F. Maximilian Czernin, Esquire (Argued), and Peter R. Morrison, Esquire, of SQUIRE PATTON BOGGS, LLP, Cincinnati, Ohio, Attorneys for Defendant.

**Adams, J.**

**INTRODUCTION**

This action was filed by BeautyCon Media ABC Trust ("Plaintiff") in its capacity as Trustee of the BeautyCon Media Company (the "Company") against the Company's investor, New General Market Partners, LLC ("Defendant" or "NGMP"). Plaintiff brought claims for breach of contract, fraudulent inducement, and tortious interference with prospective contractual relations.[1] This is the Court's decision on Defendant's motion to dismiss these claims. For the reasons stated herein, Defendant's motion is GRANTED in part and DENIED in part.

**FACTS**

**I. The BeautyCon Media Company**

The Company was founded in 2013 and created as a "fashion and beauty community portal that connected consumers with beauty brands and creators."[2] Over several years, the Company grew its business to include media and e-commerce, in addition to the beauty and fashion industry. While the Company attracted the attention of various investors, by 2018 it was struggling to fund its Series A financing. Additional funding was critical to the Company's ability to host

---

[1] Plaintiff also filed claims of breach of fiduciary duty and aiding and abetting breach of fiduciary duty. Compl. ¶¶ 73-88. On May 16, 2023, the Court dismissed these claims on the record after oral argument on Defendant's motion to dismiss. *BeautyCon Media ABC v. New General Market Partners,* C.A. No. N22C-12-143 MAA CCLD, Adams, J., Transaction ID 70026953 (Del. Super. May 16, 2023).

[2] Compl. ¶ 16. Unless otherwise stated, the facts are drawn from Plaintiff's Complaint and the attached exhibits. The Court accepts these allegations as true for purposes of a motion to dismiss.

and operate its signature event scheduled in 2018: "BeautyCon LA." In March 2018, one of the Company's investors, A&E network, rescinded its funding commitment, leaving the Company in a precarious financial situation.

## II. Defendant's Involvement with the Company

In May 2018, the Company's then CEO, Moj Mahdara ("Mahdara"), met with the head of investment of NGMP, Darryl Thompson ("Thompson"), to discuss the possibility of NGMP providing the Company with a bridge loan. Richelieu Dennis ("Dennis") of Essence Ventures (a private equity company), and founder of NGMP, had been a previous sponsor of the Company's events. Defendant committed to funding $3 million but never executed the note ("May 2018 Note") pursuant to the original terms, despite repeated assurances from Thompson.[3]

In connection with the May 2018 Note, the Company agreed to Defendant's demand that the Company "cease all conversations with other interested investors." In June 2018, Defendant made a second offer of $5 million ("NGMP 2018 Revised Offer"), which the Company accepted. The Company and Defendant also entered into a Memorandum of Understanding (the "Original MOU") in June 2018, outlining their understanding of Defendant's future investment in, and commercial partnership

---

[3] In August 2018, Defendant reduced the amount of pledged capital from $3 million to $1.678 million. Compl. ¶ 27.

with, the Company.[4]  Plaintiff alleges that in 2018 Defendant pushed the Company to move forward with a plan to expand its retail business—"BeautyCon POP"—and indicated future funding was contingent upon the Company's compliance with this expansion.  The Company's pursuit of BeautyCon POP worsened its financial situation.[5]

In 2019, the Company and Defendant entered into an Amended Memorandum of Understanding ("Amended MOU") which "extended the deadlines [in the Original MOU] for NGMP to establish a long-term commercial partnership with the Company . . . ."[6]  "Once BeautyCon POP failed to materialize," Plaintiff alleges it became clear Defendant was not going to provide the funding as contained in the MOUs or complete the common share acquisition.[7]  Plaintiff alleges that after the Company hired an investment banker in July 2019 to remedy its growing funding concerns, "[Defendant] demanded that they receive 51% of the Company as part of any transaction[]" and "backchanneled with other Series A lead investors" who "chilled" new investors at NGMP's direction.[8]

---

[4] *See infra* ANALYSIS Section II.C. for additional information on the contents of the Amended MOU, which is identical to the Original MOU, except for the deadlines in various provisions.
[5] Compl. ¶ 28.
[6] Compl. ¶ 29.
[7] Compl. ¶ 30.
[8] Compl. ¶¶ 31-32.

### III.    The Live Nation Deal

Toward the end of 2019, the Company began to seek other avenues of financing to compensate for the insufficient funding it was receiving from Defendant. In December 2019, the Company reached a deal in principle with Live Nation—an events promoter and venue operator—where Live Nation would receive a 51% stake in the Company in exchange for $4 million. Live Nation confirmed its support via emails sent on December 20 and 21, 2019.

Plaintiff alleges Defendant had been interested in acquiring the Company as early as 2018[9] and cites to a letter (the "Letter") from Thompson to Laurent Ohana ("Ohana"), the CEO of an investment bank providing advisory services to the Company.[10] In the Letter, dated December 21, 2019, Thompson indicated that he was aware the Company was seeking additional capital, voiced NGMP's belief that there was special value in having the Company operate within the Essence Ventures ecosystem, and indicated Essence Ventures' preliminary interest in purchasing the Company.[11] Plaintiff alleges Defendant attempted to "dampen" the deal with Live Nation and that the Company's management was aware of this interference as of

---

[9] Compl. ¶ 38; Ex. 13. All exhibits referenced were attached to the complaint.
[10] Ex. 12.
[11] Ex. 12; Compl. ¶ 38 (citing to Exs. 12-15).

5

January 22, 2020.[12]   The Company's tentative deal with Live Nation did not materialize.

## IV.   Defendant's May 2020 Investment

In the spring of 2020, the Company approached Defendant for additional funding needed to weather additional financial distress caused by the COVID-19 Pandemic.  NGMP originally committed to loaning the Company an additional $2 million, but ultimately agreed to only fund $500,000 (May 2020 Note).

Pursuant to the terms of the May 2020 Note, the Company was prohibited from raising additional capital unless Defendant approved the terms.  Plaintiff alleges it was "forced to pass on two prospective investors interested in investing at least $4 million" as a "direct result" of the terms of the May 2020 Note.  Plaintiff alleges that "[t]he loans orchestrated by NGMP granted it unfettered control over the Company to the ultimate benefit of NGMP."

On April 26, 2021, the Company entered into the Assignment Agreement which transferred the assets of the Assignor to the Trust.  On April 28, 2021, the Trust filed a Petition for Assignment for the Benefit of Creditors and Related Injunctive Relief in the Court of Chancery.[13]  At a virtual public auction, Defendant's

---

[12] Compl. 37; Ex. 11

[13] *In re: BeautyCon Media, Inc. Assignor to: Saccullo Business Consulting LLC*, C.A. No. 2021-0368 (PAF).

6

assignee, NGM1, lodged the successful secured party credit bid. Defendant thereafter foreclosed on substantially all of the Company's assets.

## PROCEDURAL HISTORY

Plaintiff filed its complaint on December 13, 2022, alleging five counts: Breach of Contract regarding the Original MOU and Amended MOU (Count I); Fraud in the Inducement (Count II); Tortious Interference with Prospective Contractual Relations (Count III); Breach of Fiduciary Duty (Count IV); and Aiding and Abetting Breach of Fiduciary Duty by the Company's Directors and Officers. Defendant filed its motion to dismiss on January 31, 2023. Briefing concluded on April 6, 2023. On May 16, 2023, the Court held oral argument on the motion. After the parties presented their arguments, the Court dismissed Counts IV and V for the reasons stated on the record and reserved decision on Counts I-III.[14] This is the Court's decision on Defendant's motion to dismiss the remaining counts.

## STANDARD OF REVIEW

On a Rule 12(b)(6) motion to dismiss, the Court must accept all well pled allegations as true.[15] A complaint's allegations are sufficiently "'well-pleaded' if

---

[14] *BeautyCon Media ABC v. New General Market Partners,* C.A. No. N22C-12-143 CCLD (MAA) (Del. Super. May 16, 2023) (TRANSCRIPT at 62). The Court ruled that it lacked jurisdiction over counts IV and V and that any narrow exception that may provide the Superior Court with jurisdiction did not apply to these claims.

[15] *Spence v. Funk*, 396 A.2d 967, 968 (Del. 1978).

they put the opposing party on notice of the claims being brought against it."[16] While "[v]agueness or lack of detail . . . are insufficient grounds upon which to dismiss a complaint under Rule 12(b)(6)[,]"[17] courts are not "required to accept as true conclusory allegations 'without specific supporting factual allegations' or 'every strained interpretation of the allegations . . . .'"[18] The court must assess whether the claimant "may recover under any reasonably conceivable set of circumstances susceptible of proof."[19] The court must draw every reasonable factual inference in favor of the non-moving party and must deny the motion to dismiss if the claimant may recover under that standard.[20] Dismissal will not be granted unless a claim is clearly without merit.[21]

As a general matter, when deciding a motion to dismiss pursuant to Rule 12(b)(6), the court is limited to reviewing the allegations in the complaint. The Court may review, however, documents extrinsic to the complaint when one or both of the following conditions are present: (1) when the document is "integral to a plaintiff's

---

[16] *Hale v. Elizabeth W. Murphey School, Inc.,* 2014 WL 2119652, at *2 (Del. Super. May 20, 2014) (citing *Precision Air, Inc. v. Standard Chlorine of Delaware, Inc.*, 654 A.2d 403, 406 (Del. 1995)); *Bramble v. Old Republic Gen. Ins. Corp.,* 2017 WL 345144, at *3 (Del. Super. Jan. 20, 2017) (internal citations omitted).

[17] *Bramble,* 2017 WL 345144, at *3 (internal citations omitted).

[18] *Clouser v. Doherty,* 175 A.3d 86 (TABLE), 2017 WL 3947404, at *4 (Del. 2017) (cleaned up).

[19] *Hackett v. TD Bank, N.A.,* 2023 WL 3750378, at *2 (Del. Super. May 31, 2023) (internal quotations omitted).

[20] *Hackett,* 2023 WL 3750378, at *2.

[21] *Bramble,* 2017 WL 345144, at *3 (internal citations omitted).

claim and incorporated into the complaint[;]" or (2) "when the document is not being relied upon to prove the truth of its contents."[22]

## ANALYSIS

I. **Defendant's motion to dismiss the claim for tortious interference with prospective contractual relations (Count III) is DENIED.**

In Plaintiff's claim for tortious interference with prospective contractual relations ("tortious interference"), it alleges that Defendant intentionally interfered with and damaged the Live Nation commitment. Defendant alleges three grounds for dismissal of this claim pursuant to Superior Court Civil Rule 12(b)(3) and (b)(6): (1) the claim is barred by California's statute of limitations, (2) Plaintiff has failed to allege Defendant committed an independent wrongful act, and (3) Plaintiff fails to plausibly allege Defendant's intentional interference. For the reasons that follow, Defendant's motion to dismiss this claim is DENIED.

### A. Plaintiff's claim is not barred by California's statute of limitations.

Defendant alleges that California's statute of limitations applies to this claim because California has the most significant relationship to the action relative to Delaware, the forum state. California's statute of limitations requires a plaintiff to file their claims within two years from the date when the plaintiff discovered the loss

---

[22] *Id.* (quoting *Vanderbilt Income & Growth Assocs., L.L.C., v. Arvida/JMB Managers, Inc.*, 691 A.2d 609, 613 (Del. 1996)).

9

caused by a defendant's interference.[23] Defendant alleges Plaintiff was aware of the loss caused by its alleged interference on or around January 22, 2020.[24] As Plaintiff filed its complaint on December 13, 2022, this claim would not be timely filed if California's limitation period applied. Delaware's statute of limitations for this claim provides a plaintiff with three years from the date of the tortious act causing injury.[25]

California's statute of limitations does not apply for two reasons: (1) 10 *Del. C.* § 8121 dictates that Delaware's statute of limitations applies, and (2) statutes of limitations govern matters of procedure and the procedural law of the forum state generally applies.

Pursuant to 10 *Del. C.* § 8121, for causes of action that arise outside of Delaware, the shorter statute of limitations applies, which in this case is the California statute.[26] Section 8121, however, provides for an exception for Delaware residents: "[w]here the cause of action originally accrued in favor of a person who

---

[23] Cal. Civ. P. § 339(1).

[24] Def. Op. Br. at 22; Compl. ¶ 37 ("The Company knew something was amiss on January 22, 2020, because the Company's management believed that NGMP (or its affiliates) were trying to 'dampen' the Live Nation deal.").

[25] 10 *Del. C.* § 8106. *Clouser v. Doherty,* 175 A.3d 86 (TABLE), 2017 WL 3947404, at *10 (Del. 2017) ("Tortious interference with prospective business relations is subject to a three-year statute of limitations."); *WaveDivisions Holdings, LLC.,* 2011 WL 13175837, at *9 ("In Delaware, claims for tortious interference with contractual relations are governed by the three year statute of limitations."); *BTIG, LLC v. Palantir Technologies, Inc.,* 2020 WL 95660, at *3 (Del. Super. Jan. 3, 2020) ("For tort claims, 'the wrongful act is a tortious act causing injury, and the cause of action accrues at the time of injury.'").

[26] *Supra* n. 23; 10 *Del. C.* § 8121.

10

at the time of such accrual was a resident of this State, the time limited by the law of this State shall apply."[27] "Our courts have held this to mean that a Delaware corporation is a Delaware 'resident' for the purpose of bringing an action in Delaware court."[28] The Company was a resident of Delaware when this cause of action accrued,[29] therefore, Delaware's statute of limitations applies.

Additionally, under a conflicts of law analysis, as a general rule the forum state applies its own statute of limitations.[30] "This is consistent with the general principle that the procedural law of the forum state (here, Delaware) usually applies."[31] The Court will apply Delaware's three-year statute of limitations because this is purely a procedural matter.[32] Defendant only argues that Plaintiff does not meet California's two-year statute of limitations, therefore, the Court declines to analyze whether Plaintiff timely filed its claim within Delaware's longer statute of limitations.

---

[27] 10 *Del. C.* § 8121.

[28] *WaveDivision Holdings, LLC,* 2011 WL 13175837, at *8.

[29] Compl. ¶ 11.

[30] *US Dominion v. Fox Corp.,* 2022 WL 2229781, at *6 (Del. Super., June 21, 2022) (cleaned up); *Weinstein v. Luxeyard, Inc.,* 2022 WL 130973, at *3 (Del. Super. Jan. 14, 2022).

[31] *US Dominion,* 2022 WL 2229781, at *6 (cleaned up); *Weinstein,* 2022 WL 130973, at *3.

[32] *Am. Energy Tech., Inc. v. Colley & McCoy Co.,* 1999 WL 301648, at *2 (D. Del. Apr. 15, 1999) ("Statutes of limitations are generally considered to be procedural rather than substantive law."); *Weinstein,* 2022 WL 130973, at *3 (quoting *MPEG LA, L.L.C. v. Dell Global B.V.,* 2013 WL 812489, at *3 (Del. Ch. Mar. 6, 2013)) (A modification of the general rule that the procedural law of the forum state applies may be necessary when "the procedural law of the foreign state is so inseparably interwoven with substantive rights[,]" such that a modification is necessary to safeguard a party's legal rights)).

**B. Delaware substantive law applies to the tortious interference claim because there is no actual conflict between California and Delaware law.**

Defendant alleges that Plaintiff has failed to state a claim for tortious interference because Plaintiff has failed to allege that Defendant committed an independent wrongful act, which is an element of tortious interference with prospective contractual relations pursuant to California law.[33]  Plaintiff argues that Delaware law applies and that this element is not required under Delaware law. Determining the elements of a legal claim and whether such elements are sufficiently pled involves issues of substantive law.  The Court, therefore, must first engage in a choice of law analysis to determine whether California or Delaware's substantive law applies.

A conflicts of tort law analysis consists of two steps.[34]  The court must first determine whether there is an actual conflict between the elements of the tort as they are defined by the  jurisdictions at issue.[35]  If there is an actual conflict, courts must then determine which state has the "most significant relationship" to the case.[36]  If there is not an actual conflict, the court applies the substantive law of the forum

---

[33] Defendant also alleges that Plaintiff failed to plausibly allege Defendant's intentional interference. The Court addresses this ground separately in the section to follow.  Def. Op. Br. at 24-27.

[34] *KT4 Partners LLC v. Palantir Tech., Inc*., 2021 WL 2823567, at *12 (Del. Super. June 24, 2021); *Otto Candies, LLC v. KPMG, LLC,* 2020 WL 4917596, at *5 (Del. Ch. Aug. 21, 2020).

[35] *Bell Helicopter Textron, Inc.*, 113 A.3d 1045, 1050 (Del. 2015).

[36] *Travelers Indem. Co. v. Lake,* 594 A.2d 38, 47 (Del. 1991).

state.[37]  "Delaware law recognizes two situations in which a conflict of law is false."[38]  If one of the two states have not addressed the legal question presented, then there can be no conflict and the court must apply the law of the state that has "settled law" on the matter.[39]  The court also need not engage in a choice of law analysis if the result would be the same under either state's law.[40]

The first situation does not apply to this case because both "California and Delaware have addressed the elements of, and defenses to, tortious interference with prospective contractual relations claims."[41]  Because the parties argue that the result would be different depending on which State's law applies, the Court will analyze whether an actual conflict exists between California and Delaware's definition of tortious interference with prospective contractual relations.

The Court finds that the elements of tortious interference between California and Delaware are the same in all important respects, therefore, no actual conflict

---

[37] *Otto Candies, LLC,* 2020 WL 4917596, at *6, 18, 21; *KT4 Partners, LLC*, 2021 WL 2823567, at *12.

[38] *KT4 Partners LLC*, 2021 WL 2823567, at *12; *see also In re Bay Hills Emerging Partners I, LP,* 2018 WL 3217650, at *5 (Del. Ch. July 2, 2018) (stating there is a false conflict when "there is no material difference between the laws of competing jurisdictions").

[39] *Arch Insurance Co. v. Murdoch,* 2018 WL 1129110, at *8 (Del. Super. Mar. 1, 2018) ("When one state's laws failed to address a particular issue, it cannot conflict with the laws of another state. Where one state fails to address a particular issue, the Court should apply the settled law.") (cleaned up); *KT4 Partners LLC*, 2021 WL 2823567, at *12.

[40] *Deuley v. DynCorp Int'l, Inc.,* 8 A.3d 1156, 1161 (Del. 2010); *KT4 Partners LLC*, 2021 WL 2823567, at *12.

[41] *KT4 Partners LLC*, 2021 WL 2823567, at *12; *Great American Opportunities, Inc. v. Cherrydale Fundraising, Inc.,* 2010 WL 338219, at *8 (Del. Ch. Jan. 29, 2010) (stating both California and Delaware require the same basic elements to establish a claim for tortious interference with prospective contractual relations.).

exists.  Because no actual conflict exists, the substantive law of Delaware, the forum

state, applies.

Pursuant to California law, a claim for tortious interference with prospective

economic advantage consists of the following elements:

> (i) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff;
> (ii) the defendant's knowledge of the relationship;
> (iii) intentional acts on the part of the defendant designed to disrupt the relationship;
> (iv) actual disruption of the relationship; and
> (v) economic harm to the plaintiff proximately caused by the acts of the defendant.[42]

California law also requires a plaintiff to prove that the defendant has

committed an "independent wrongful act."  An act is independently wrongful if it is

"unlawful, [*i.e.*,] proscribed by some constitutional, statutory, regulatory, common

law or other determinable legal standard."[43]  California imposes the requirement of

---

[42] *Golden Eagle Land Investment, LP v. Rancho Santa Fe Ass'n.,* 227 Cal. Rptr. 3d 903, at 927 (Cal. Ct. App. 4th Jan. 12, 2018) (cleaned up); *SC Manufactured Homes, Inc. v. Canyon View Estates, Inc*., 56 Cal. Rptr. 3d 79, n. 7 (Cal. Ct. App. 2d Mar. 15, 2007).  California courts typically identify this tort by the name "tortious interference with prospective economic advantage." *See, e.g., Golden Eagle Land Investment, LP,* 227 Cal. Rptr. 3d at 927.  Delaware identifies this tort as either tortious interference with prospective "economic advantage," "contractual relations" or business relations.   *See, e.g., KT4 Partners,* 2021 WL 2823567, at *13; *Clouser v. Doherty,* 175 A.3d 86 (TABLE), 2017 WL 3947404, at *10 (Del. 2017); *Organovo Holdings, Inc. v. Dimitrov,* 162 A.3d 102, 122 (Del. Ch. June 5, 2017).  Regardless of the slight variations in names, the elements of the torts, however, are the same in all important respects.
[43] *KT4 Partners,* 2021 WL 2823567, at *13 (quoting *Edwards v. Arthur Anderson, LLP*, 189 P.3d 285, 290 (Cal. 2008)).

14

an independent wrongful act to make unlawful "improper methods of disrupting or diverting the business relationship" while also protecting "fair competition."[44]

A claim for tortious interference with prospective contractual relations pursuant to Delaware law consists of the following elements:

> (i) the reasonable probability of a business opportunity;
> (ii) intentional interference by a defendant with that opportunity;
> (iii) proximate causation; and
> (iv) damages.[45]

Delaware courts are "to consider these elements 'in light of a defendant's privilege to compete or protect his business interests in a fair and lawful manner'"[46] so that this tort does not unduly restrict free competition.[47]  If a defendant acts within his privilege to compete, those actions are protected by the business competition exception, and are not independently wrongful.[48]  Delaware courts look to the following elements in the Second Restatement of Torts to assess whether competition constitutes proper or improper interference:

> (a) the relation concerns a matter involved in the competition between the actor and the other and
> (b) the actor does not employ wrongful means and
> (c) his action does not create or continue an unlawful restraint of trade and

[44] *Golden Eagle Land Investment, LP,* 227 Cal. Rptr. 3d at 927 (quoting *Settimo Associates v. Environ Systems, Inc.* 17 Cal. Rptr. 2d 757, 758 (Cal. Ct. App. 4th Mar. 26, 1993)).

[45] *Clouser v. Doherty,* 175 A.3d 86 (TABLE), 2017 WL 3947404, at *10 (Del. 2017).

[46] *KT4 Partners LLC*, 2021 WL 2823567, at *13 (quoting *Kable Products Services, Inc. v. TNG GP*, 2017 WL 2558270, at *10 (Del. Super. June 13, 2017) (internal quotation marks omitted)).

[47] *See Agilent Technologies v. Kirkland,* 2009 WL 119865, at *8 (Del. Super. Jan. 20, 2009).

[48] *Preston Hollow, LLC v. Nuveen, LLC,* 2020 WL 1814756, at *17 (Del. Ch. Apr. 9, 2020).

(d) his purpose is at least in part to advance his interest in competing with the other.[49]

Courts must find that all four factors are met to conclude that a defendant's competitive actions are proper.[50] If a defendant's actions violate statutory or common law, this satisfies the independent wrongfulness requirement pursuant to Delaware law and the conduct would not be protected by the business competition exception.[51] The nature of the defendant's conduct is the principal factor in analyzing whether a defendant's conduct is independently wrongful.[52]

The Court finds that the elements of this tort under California and Delaware law are the same in all important respects. Both require some form of prospective economic relationship between the plaintiff and a third party. Delaware requires the "probability of a business opportunity" whereas California law requires the "probability of an economic benefit." The Court finds these terms to be substantially similar.

---

[49] RESTATEMENT (SECOND) OF TORTS § 767 (1979). To assess whether a defendant's actions are independently wrongful, Delaware courts analyze the following factors: (i) the nature of the actor's conduct; (ii) the actor's motive; (iii) the interests of the other with which the actor's conduct interferes; (iv) the interests sought to be advanced by the actor; (v) the social interests in protecting the freedom of action of the actor and the contractual interests of the other; (vi) the proximity or remoteness of the actor's conduct to the interference; and (vii) the relations between the parties. RESTATEMENT (SECOND) OF TORTS § 767 (1979); *Preston Hollow Capital, LLC*, 2020 WL 1814756, at *17 (citing RESTATEMENT (SECOND) OF TORTS § 767 (1979)).

[50] RESTATEMENT (SECOND) OF TORTS § 768; *Preston Hollow Capital, LLC,* 2020 WL 1814756, at *17 (stating the court must find all four factors are met before excusing the defendant under this analysis.).

[51] RESTATEMENT (SECOND) OF TORTS § 767 cmt. c.

[52] *Preston Hollow*, 2020 WL 1814756, at *17.

Both states also require defendant's knowledge of the relationship between the plaintiff and the third party. California law requires that a plaintiff show the defendant's knowledge of the plaintiff's relationship with the third party while Delaware requires a showing of intentional interference with the prospective business relationship. It is not logically possible for a defendant to intentionally interfere with the relationship without first having knowledge of that relationship, thus both states have a knowledge requirement.[53]

Both states require that the act causing interference was committed intentionally and that the interference results in damages. Additionally, both states require that defendant's conduct be independently wrongful to safeguard against the infringement of free competition.[54] "To be independently wrongful, each state asks

[53] *DG BF, LLC v. Ray*, 2021 WL 776742, at n. 146 (Del. Ch. Mar. 1, 2021).

[54] *Kable Products Services, Inc. v. TNG GP*, 2017 WL 2558270, at *10 (Del. Super. June 13, 2017) (quoting *DeBonaventura v. Nationwide Mut. Ins. Co.*, 419 A.2d 942, 947 (Del. Ch. 1980)) (stating elements of this claim "must be considered in light of a defendant's privilege to compete or protect his business interests in a fair and lawful manner."); *Orthopaedic Assoc. of S. Delaware, PA v. Pfaff*, 2018 WL 822020, at *2 (Del. Super. Feb. 9, 2018); *Preston Hollow Capital,* 2020 WL 1814756, at *12 ("The tort is unusual, in that its application, even if these elements are met, is circumscribed by consideration of competing rights. Thus, the elements of the tort must be considered in light of a defendant's privilege to compete in a lawful manner."); *Beard Research, Inc. v. Kates,* 8 A.3d 573, 608 (Del. Ch. Apr. 23, 2010) ("The tortious interference with prospective business relations standard is arguably more favorable to a defendant than the tortious interference with contractual relations standard because, under the former standard, a court must consider the defendant's privilege to compete or protect his business interests in a fair and lawful manner."); *Agilent Technologies v. Kirkland,* 2009 WL 119865, at *5 (Del. Super. Jan. 20, 2009); *Korea Supply Co. v. Lockheed Martin Corp.*, 63 P.3d 937, 953 (Cal. 2003) (stating a plaintiff bringing a claim for interference with prospective economic advance must show defendant's conduct was independently wrongful); *Quelimane Co. v. Stewart Title Guaranty Co.*, 960 P.2d 513, 530 (Cal. 1998) (stating claim for tortious interference with prospective economic advantage, unlike tortious interference with an existing contract, requires plaintiffs to establish conduct was wrongful); *Ixchel Pharma, LLC v. Biogen, Inc.*, 470 P.3d 571, 576 (Cal. 2020) ("intentionally interfering with

whether the defendant's conduct constitutes a violation of positive law, judicial rulings, or expressly or by implication, a 'determinable legal standard.'"[55] Because the result would be the same under either state's law, the conflict is false and Delaware law applies.

## C. Plaintiff sufficiently alleged Defendant committed an independent wrongful act.[56]

For Plaintiff to show that Defendant tortiously interfered with Plaintiff's prospective contractual relations with Live Nation, it must show Defendant's conduct was wrongful independent of the interference and not protected by the business competition exception.[57] The business competition exception "rests on the belief that competition is a necessary or desirable incident of free enterprise"[58] and exists to prevent "wholesome competitive practices" from being "made tortious."[59]

---

prospective economic advantage requires pleading that the defendant committed an independently wrongful act.").

[55] *KT4 Partners LLC v. Palantir Tech., Inc.*, 2021 WL 2823567, at *14 (Del. Super. June 24, 2021) (cleaned up).

[56] Because Defendant contests only that Plaintiff has failed to sufficiently plead that Defendant committed an independent wrongful act and intentionally interfered, the Court limits its Rule 12(b)(6) analysis to these two elements.

[57] *KT4 Partners, LLC*, 2021 WL 2823567, at *13; *Preston Hollow Capital, LLC,* 2020 WL 1814756, at *12. The Court notes that Plaintiff did not expressly include the term "independent wrongful act" in its count for tortious interference. Defendant raised this requirement as an affirmative defense to the claim of tortious interference. Def. Op. Br. at 23-24. In Plaintiff's brief in opposition to Defendant's motion to dismiss, Plaintiff only asserts that independent wrongfulness is not a requirement pursuant to Delaware law. Pl. Br. at 32-33. As explained above, Delaware does require plaintiffs to plead an independent wrongful act. Because this is a requirement and because Defendant raised this as an affirmative defense in the motion to dismiss, the Court will analyze whether Plaintiff has sufficiently alleged that Defendant committed an independent wrongful act.

[58] RESTATEMENT (SECOND) OF TORTS § 768 cmt. on Clause (b).

[59] *NuVasive, Inc. v. Miles*, 2020 WL 5106554, at *12 (Del. Ch. Aug. 31, 2020).

Competition is not necessarily an improper basis for interference. [60] "If one party is seeking to acquire a prospective contractual relation, the other can seek to acquire it too."[61]

The second element in § 768 asks whether the defendant has employed wrongful means. Delaware courts look to the factors listed in § 767 to determine whether a defendant has employed wrongful means. When a plaintiff has only a prospective contractual relationship with a third party as opposed to a present contractual relationship, there is a higher burden on the plaintiff to show that the defendant improperly interfered with that relationship.[62] The burden for the plaintiff is lower in the context of a present contractual relationship because of "the greater definiteness of the [plaintiff's] expectancy and his stronger claim to security for it and in part to the lesser social utility of the [defendant's] conduct."[63]

While the nature of Defendant's conduct related to the Live Nation deal when viewed in isolation is not improper, the Court finds that when viewed within the larger context of Defendant's actions, Plaintiff has sufficiently pled that Defendant committed an independent wrongful act pursuant to § 767 and § 768. Plaintiff has

---

[60] RESTATEMENT (SECOND) OF TORTS § 768 cmt. a.
[61] *Id.*
[62] § 767 cmt. on Clause (c) ("the actor's conduct in interfering with the other's prospective contractual relations with a third party may be held to be not improper, although his interference would be improper if it involved persuading the third party to commit a breach of an existing contract with the other.").
[63] *Id.*

pled sufficient facts at this stage to establish that Defendant's conduct was part of a larger scheme of economic pressure it wrongfully exerted upon the Company for the ultimate purpose of takeover. This finding is based primarily on an analysis of certain enumerated factors in § 767, specifically Defendant and the Company's ("the Parties") interests, and Defendant's purpose or motivation for interfering with the Live Nation deal.[64] Because the Court finds Defendant has employed wrongful means, it will not address the remaining elements of the business competition exception.[65]

### 1. The Nature of Defendant's Conduct Relating to the Live Nation Deal

The "chief factor in determining whether the conduct is privileged despite its harm to the other person," is the nature of a defendant's conduct.[66] As stated above, the Company and Live Nation reached a deal in principle in December 2019, with Live Nation confirming its support in writing on December 20 and 21, 2019. Plaintiff alleges the nature of Defendant's conduct in response to the deal as follows:

- Thompson's letter to Ohana wherein he expressed awareness that the Company was "seeking to raise additional equity capital[,]" conveying

---

[64] For the sake of economy, the Court hereinafter refers to "Defendant and the Company" collectively as "the parties," while noting that Plaintiff is not the Company, but the BeautyCon Media ABC Trust in its capacity as Trustee of the Company.

[65] *See* § 767; *Preston Hollow Capital, LLC v. Nuveen, LLC,* 2020 WL 1814756, at *17 (Del. Ch. Apr. 9, 2020) (declining to address the remaining elements, having found defendant employed wrongful means in its competition with plaintiff.).

[66] § 767 cmt. on Clause (a).

Essence Ventures' "preliminary indication of interest to purchase certain assets of [the Company,]" and conveying Essence Ventures' belief that "there is special value [] by having [the Company] operate within the Essence Ventures ecosystem."[67]

- "[U]pon information and belief, [Defendant] was in contact with Live Nation about [Defendant's] non-support of the proposed Live Nation deal" and told Live Nation that it preferred to "roll-up" the Company with other brands to sell as one package.[68]

To summarize, Plaintiff alleges that Defendant intentionally interfered with the Live Nation deal when Defendant's head of investment contacted the Company's investment banker to discourage the Live Nation deal and encouraged the sale of the Company to Essence Ventures; and when Defendant allegedly contacted Live Nation directly around January 2020 to discourage the deal.

This conduct is not in itself wrongful. Plaintiff does not identify any of Defendant's conduct as violative of statutory law, common law or "legal standards of behavior more broadly."[69] There is no allegation that Defendant committed any

---

[67] Compl. ¶ 38; Ex. 12.
[68] Compl. ¶ 36.
[69] *KT4 Partners LLC v. Palantir Tech., Inc.*, 2021 WL 2823567, at *19 (Del. Super. June 24, 2021).

acts of physical violence, threatened suit, or made any false representations to Live Nation to induce it to pull away from the deal.[70]

## 2. Plaintiff sufficiently alleged that Defendant exerted improper economic pressure on the Company.

The nature of Defendant's conduct with respect to the Live Nation deal, in isolation, is not wrongful. The question remains, however, whether this conduct was proper when viewed within the larger context of Defendant's dealings with the Company.[71] For the reasons that follow, the Court finds that, viewing the complaint as a whole and drawing all reasonable inferences therefrom, Plaintiff has sufficiently alleged Defendant's conduct with respect to Live Nation was committed in furtherance of Defendant's goal to weaken the Company's capital structure and position itself to take over the Company. As an investor who also entered into MOUs to negotiate a long-term commercial partnership with the Company, the Court finds that Defendant's conduct was improper and not protected by the business competition exception.

"A party loses its privilege to compete if it exerts improper economic pressure . . . . Propriety of economic pressure is a contextual inquiry: there is no 'crystallized set of definite rules,' and the 'decision therefore depends upon a judgment and

---

[70] § 767 cmt. on Clause (a).
[71] *Preston Hollow Capital, LLC,* 2020 WL 1814756, at *17.

choice of values in each situation.'"[72]  When analyzing whether a defendant's conduct was independently wrongful due to economic pressure, "it is proper to look at the entire picture to understand the economic pressure applied."[73]  Although a defendant may exert limited economic pressure, "Delaware law also recognizes that when a defendant intends the interference to drive a competitor out of business and 'shut its doors,' this constitutes wrongful means, and the conduct is not privileged."[74]

At the motion to dismiss phase, Plaintiff sufficiently alleges Defendant exerted wrongful economic pressure in a concerted effort to take ownership of the Company.[75]  Plaintiff alleges Defendant accomplished this by delaying or refusing to fully fund promised investments,[76] demanding the Company not solicit other

---

[72] *Id.* at *18 (quoting § 767 cmt. b.); § 767 cmt. on Clause (a) (To examine the propriety of economic pressure, courts should assess "the circumstances in which it is exerted, the object sought to be accomplished by the actor, the degree of coercion involved, the extent of the harm that it threatens, the effect upon the neutral parties drawn into the situation, the effects upon competition, and the general reasonableness and appropriateness of this pressure as a means of accomplishing the actor's objective.").

[73] *Preston Hollow LLC,* 2020 WL 1814756, at *18.

[74] *Id.* (citing *Beard Research, Inc. v. Kates*, 8 A.3d 573, 611–12 (Del. Ch. Apr. 23, 2010), *aff'd sub nom. ASDI, Inc. v. Beard Research, Inc.*, 11 A.3d 749 (Del. 2010).  Limited economic pressure is permitted as long as a defendant avoids an illegal restraint on trade and does not intentionally interfere to drive a competitor out of business.  *Id.*

[75] The Letter expressed a desire that Essence Ventures purchase the Company.  Ex. 12.  Plaintiff also alleged "numerous conversations" from 2018 forward wherein Thompson allegedly expressed a desire to own the Company.  Compl. ¶ 38.

[76] Plaintiff alleges: Defendant committed to a $3 million investment in the May 2018 Note, but reduced the amount of pledged capital to $1.678 million in August 2018; in June 2018, Defendant committed to funding a $5 million convertible note based on a $27 million valuation, as opposed to the $60 million valuation agreed upon approximately one month earlier ("NGMP 2018 Revised Offer"); instead of timely funding $2 million promised in the May 2020 Note, Defendant delayed and only funded $500,000, and with the knowledge that this amount "left many vendors and other customers" of the Company unpaid during the pandemic; Defendant never completed its commitments under the Amended MOU).

investors,[77] discouraging other investors from investing in the company,[78] and conditioning future investment on the Company's pursuit of commercial endeavors harmful to its financial interests,[79] all while Defendant allegedly knew of the Company's dire financial situation.[80] Defendant's conduct with respect to the Live Nation deal, when viewed in this broader context, sufficiently alleges that Defendant interfered with the Deal as a means of exerting improper economic pressure on the Company.

The presence of economic pressure in this case shares similarities with that found in *Preston Hollow, LLC v. Nuveen, LLC.*[81] In *Preston Hollow,* the court found

---

[77] In conjunction with the May 2018 Note, Plaintiff alleges Defendant demanded the Company cease all conversations with other interested investors; the May 2020 Note prohibited the Company from raising additional capital without preapproval from Defendant, resulting in the Company foregoing two prospective investment offers which could have delivered at least $4 million in capital. *See* Ex. 20.

[78] Plaintiff alleges Defendant demanded it receive 51% of the Company once it learned that the Company had hired an investment banker, which allegedly deterred potential investors; Defendant consorted with other Series A lead investors to chill new investors; Defendant expressed to Live Nation its non-support of Live Nation's $5 million investment and "dampened" the deal.

[79] Dennis and Thompson allegedly told the Company it would only fund the Original MOU if the Company moved forward with BeautyCon POP, which the Company allegedly told Defendant was stretching to the "breaking point."

[80] Compl. ¶ 42. "Upon information and belief, [Defendant] was aware that funding only 25% of the promised amount left many vendors and other customers of [the Company] unpaid during the middle of a global pandemic . . . .").

[81] 2020 WL 1814756 (Del. Ch. Apr. 9, 2020). The Court notes that *Preston Hollow* is a post-trial memorandum opinion. The Court of Chancery found by a preponderance of the evidence that the defendant committed tortious interference with prospective business relations after a review of the evidence submitted at trial. *Id.* at *11-12; *see Robinson v. Oakwood Village, LLC,* 2017 WL 1548549, at *11 (Del. Ch. Apr. 28, 2017) (stating plaintiffs bare the burden of proving each element of their claims by a preponderance of the evidence). The Court does not have the benefit of viewing evidence and testimony that would be submitted at trial, however, Plaintiff has a lesser burden here defending against the motion to dismiss compared to proving this claim at trial by a preponderance of the evidence. At this stage in the litigation, Plaintiff need not prove that

24

that, while each of the defendant's interactions with third parties may not have amounted to wrongful means of shutting down the plaintiff's ability to do business, when the court considered the defendant's conduct as a whole, it revealed the defendant's systematic efforts to push the plaintiff out of business.[82] Here, while Defendant's alleged interaction with Live Nation and letter communication with the Company's investment banker may not be sufficient to establish wrongful means of interfering with the Live Nation deal, when these alleged acts are viewed in the context of Defendant's broader efforts to control and take ownership of the Company, it is reasonably conceivable at the pleading stage that this conduct was part of a broader campaign of exerting economic pressure on the Company.

The Court notes that additional factors in § 767, namely Defendant's motivation, the Parties' relationship, their respective interests, and social interests weigh in favor of a finding that Defendant's conduct is not protected by the business competition exception. It is not necessary at this stage to analyze these factors as the Court has already found Plaintiff sufficiently alleged Defendant exerted improper economic pressure on the Company.

---

Defendant did in fact tortiously interfere, but only that it has alleged "a reasonably conceivable set of facts susceptible to proof entitling it to relief." *See Hackett v. TD Bank, N.A.,* 2023 WL 3750378, at *2 (Del. Super. May 31, 2023) (internal quotations omitted).

[82] *See Preston Hollow,* 2020 WL 1814756, at *18-19 (finding defendant exerted improper economic pressure because "[t]he record, taken as a whole, shows consistent, systematic efforts by [the defendant] to shut down [the plaintiff's] ability to continue to do business."). *Id.* at *18.

**D. Plaintiff has plausibly alleged Defendant intentionally interfered with the Live Nation deal.**

Defendant also argues Plaintiff's tortious interference claim should be dismissed because Plaintiff failed to plausible allege that Defendant intentionally interfered with the Live Nation deal. The analysis required for the intentional interference requirement overlaps substantially with the above analysis on the independent wrongful act requirement. The Court will not unnecessarily duplicate that analysis here and briefly sets forth the reasons demonstrating that Plaintiff has plausibly alleged intentional interference.

"The interference with the other's prospective contractual relation is intentional if the actor desires to bring it about or if he knows that the interference is certain or substantially certain to occur as a result of his action."[83] At this stage of the proceedings, the Court must accept all non-conclusory allegations as true. Plaintiff's allegation of intentional interference would be conclusory if, for example, it stated only that "Defendant intentionally interfered because Defendant intentionally interfered." This example is not to suggest that an allegation of any greater specificity would adequately plead this element. Plaintiff's allegations, however, go far enough beyond this by including: (1) how Defendant interfered, (2) when Defendant interfered, (3) the individuals involved in the interference, (4) why

---

[83] RESTATEMENT (SECOND) OF TORTS § 766B cmt. d. (1979).

Defendant may have interfered (to purchase the Company), (5) and the proximity in time between the acts of interference and the deal's failure.

Plaintiff alleged Defendant interfered by way of the Letter that Thompson sent on the same day Live Nation confirmed its support. The Letter in no uncertain terms expressed Defendant's dislike for the deal. When drawing all reasonable inference from the complaint, it is no far inferential leap that Defendant contacted Live Nation with the intent to quelch the deal, especially considering that this deal would likely decrease Defendant's stake in the Company.[84] For these reasons, the Court finds Plaintiff has sufficiently stated that Defendant desired to bring about the interference, or at the very least knew that its actions made it substantially certain interference would occur.

II.  **Defendant's motion to dismiss the claim for breach of contract regarding of the Original MOU and Amended MOU (Count I) is GRANTED in part.**

A. **California law applies to Plaintiff's claim for breach of the MOUs.**

The MOUs contain identical California choice-of-law provisions. The choice-of-law provision states, "This Agreement and all actions arising out of or in connection with this Agreement shall be governed by and construed in accordance with the laws of the State of California, without regard to the conflicts of law

---

[84] Plaintiff also alleged that Defendant contacted Live Nation directly to convey its non-support of the deal and preference to combine the Company with various brands to sell as one package. Compl. ¶ 36.

provisions of the State of California or of any other state."[85]  As a general matter, where parties specify a choice of law, Section 187 of the Restatement (Second) of Conflicts "allows the law of the state chosen by the parties to govern contractual rights and duties unless the chosen state lacks a substantial relationship to the parties or transaction or applying the law of the chosen state will offend a fundamental policy of a state with a material greater interest."[86]  The parties do not dispute that California law applies to Plaintiff's breach of contract claims.  The Court finds that this choice-of-law provision is valid and enforceable and that the exceptions listed in Section 187 do not apply to this case.[87]  Principles of contract law as applied by California courts therefore apply to this claim.[88]

**B. Defendant's motion to dismiss the claim for breach of the Original MOU is GRANTED.**

In Count I of the complaint, Plaintiff alleges that Defendant breached both the Original MOU and the Amended MOU.  In Defendant's first ground for dismissal,

---

[85] Exs. 5, 5-A.

[86] *SIGA Technologies, Inc. v. PharmaAthene, Inc.,* 67 A.3d 330, 342 (Del. 2013) (citing RESTATEMENT (SECOND) OF CONFLICTS OF LAWS § 187 (1971), then quoting *Abry Partners V, L.P. v. F & W Acq. LLC,* 891 A.2d 1032, 1047 (Del. Ch. Feb. 14, 2006)); *Change Capital Partners Fund I, LLC v. Volt Electrical Sys., LLC*, 2018 WL 1635006, at * 1 (Del. Super. Apr. 3, 2018) ("Delaware courts are generally reluctant to subvert parties' agreed-upon choice-of-law provisions.").

[87] The Court does not find that California lacks a substantial relationship to the parties or transaction.  The Company's headquarters were located in California, the parties' relationship was centered in California, injury to the Company was suffered in California, and key witnesses are located in California.

[88] *See infra* ANALYSIS Section II.C.4.

it argues that Plaintiff's claim of breach of the original MOU is barred by the Amended MOU based on the integration clause in the Amended MOU:

> This Agreement constitutes the sole and entire agreement of the parties to this agreement with respect to the subject matter contained herein, and supersedes all prior contemporaneous understandings and agreements, both written and oral, with respect to such subject matter.

Pursuant to California law,

> "[w]hen the parties to an agreement express their intention that it is the final and complete expression of their agreement, an integration occurs. Such a contract may not be contradicted by evidence of other agreements. Whether an agreement is an integration, i.e., intended as the final and complete expression of the parties' agreement, is a question of law . . . ."[89]

As Plaintiff correctly asserts, the MOUs are identical except for the fact that the Amended MOU extended the deadlines for performance. Curiously, Plaintiff does not contest the validity or enforceability of the integration clause and simply states that it has pled a viable claim of breach of both MOUs.

The Court finds no merit to Plaintiff's claim that the original MOU is still actionable in light of the integration clause. The parties agreed in unequivocal language that the Amended MOU superseded all prior written agreements, which includes the Original MOU. Any deadlines in the Original MOU, therefore, were

---

[89] *Williams v. Atria Las Posas,* 235 Cal. Rptr. 3d 341, 344 (Cal. Ct. App. 2d. June 27, 2018) (internal citations omitted).

superseded by the new deadlines in the Amended MOU. Defendant's motion to dismiss Plaintiff's claim of breach of the Original MOU is GRANTED.

### C. Defendant's motion to dismiss the claim for breach of the Amended MOU is GRANTED in part.

The parties executed the Amended MOU on December 16, 2018, which "sets forth certain agreements and understandings" between the Parties. The purpose of the document, as stated in paragraph 1, is "to outline the terms and conditions under which the parties intend that Investor [Defendant] will provide subsequent investment in the Company." Paragraph 2, titled "Partnership framework" states that "[t]he Parties would like to enter into an understanding for a larger partnership going forward, which is connected, but not contingent on, Investor's [Defendant] investment of $5.0M." The MOU lists the following key elements of this partnership: "Qualified Financing Investment," "Common Share Acquisition," and "Commercial Agreement(s)."

#### 1. The Partnership Framework

Under the "Qualified Financing Investment" provision ("QFI Provision"), the parties agreed that the Company would use "commercially reasonable efforts to provide that Investor [Defendant] will be permitted to invest additional amounts in

30

the first Qualified Financing (as defined in the Note) after the date hereof, which may occur . . . no later than June 2019."[90] The parties agreed:

> "within 6 months of the closing of the Note investment, the Company and Investor shall negotiate in good faith with respect to the terms and conditions upon which Investor would serve as the lead investor in the Qualified Financing, with an investment of at least $10 million in additional capital."[91]

The "Common Share Acquisition" provision ("CSA Provision") of the partnership framework provides that the Company believed certain existing holders of Common Stock would be willing to sell their existing shares to Defendant. The Parties agreed that the Company would use "commercially reasonable efforts to cooperate with Investor [Defendant]" so that Defendant could acquire such shares. This provision also memorialized Defendant's understanding that the number of shares and pricing was "not guaranteed." The Parties agreed to cooperate to complete this acquisition by March 1, 2019.[92] The "Commercial Agreement(s)" provision provides that the parties agreed to "negotiate in good faith to establish a long-term commercial partnership across multiple lines of business no later than March 31, 2019."[93]

---

[90] By the terms of the Original MOU, the deadline for the qualified financing investment was March 2019.

[91] Am. MOU (emphasis added).

[92] By the terms of the Original MOU, the deadline for the common shares acquisition was December 31, 2018.

[93] Am. MOU (emphasis added). By the terms of the Original MOU, the deadline to establish a long-term commercial partnership was December 31, 2018.

## 2. Plaintiff's Allegations of Breach of the Amended MOU

Plaintiff alleges Defendant breached the three provisions summarized above in the following ways:

- "[A]mong other things . . . [Defendant] fail[ed] to serve as the lead investor in the Qualified Financing, with an investment of at least $10M in additional capital."[94]

- Defendant failed to complete the common shares acquisition.[95]

- "[A]mong other things[,] . . . failing to establish a long-term commercial partnership . . . ."[96]

Plaintiff alleges damages of no less than $10 million. Defendant asserts Plaintiff's claims under the MOUs should be dismissed because the terms are not sufficiently definite to support a breach of contract claim.

For the reasons that follow, Defendant's motion to dismiss Plaintiff's claim for breach of the Common Shares Acquisition Provision is GRANTED; Defendant's motion to dismiss Plaintiff's claim for breach of the Qualified Financing Provision and the Commercial Agreement(s) Provision is GRANTED in part, because the agreement to "negotiate in good faith" is enforceable pursuant to California law.

---

[94] Compl. ¶ 56. Plaintiff does not allege that Defendant failed to fund the NGMP 2018 Revised Offer referenced in Paragraph 2.a. of the Amended MOU and the first sentence of the QFI Provision.
[95] Compl. ¶ 57.
[96] Compl. ¶ 57.

### 3. Principles of California Contract Law

For a contract to be enforceable, the terms must be sufficiently definite.[97]  A contract's terms are sufficiently definite if they create a reasonable certainty of performance and "provide a basis for determining breach and fashioning a remedy."[98]  "If, by contrast, a supposed 'contract' does not provide a basis for determining what obligations the parties have agreed to, and hence does not make possible a determination of whether those agreed obligations have been breached, there is no contract."[99]

An "agreement to agree" is not sufficiently definite to be enforceable.[100]  "It is still the general rule that where any of the essential elements of a promise are reserved for the future agreement of both parties, no legal obligation arises 'until such future agreement is made.'"[101]  "Whether a term is essential depends on its relative importance to the parties and whether its absence from the contract would make enforcing the contract unfair to any party."[102]

---

[97] *Ladas v. California State Auto. Ass'n,* 23 Cal. Rptr. 2d 810, 814 (Cal. Ct. App. 1st Oct. 22, 1993).

[98] *Gordon v. Rother,* 2019 WL 762151, at *5 (Cal. Ct. App. 2d Feb. 21, 2019); *Weddington Productions Inc. v. Flick,* 71 Cal. Rptr. 2d 265, 277 (Cal. Ct. App. 2d Jan. 7, 1998).

[99] *Weddington Productions Inc.*, 71 Cal. Rptr. 2d at 277.

[100] *Gordon,* 2019 WL 762151, at *5 (quoting *Copeland v. Baskin Robbins USA,* 117 Cal. Rptr. 2d 875 (Cal. App. Ct. 2d. Mar. 19, 2002)).

[101] *Id.* (quoting *Baskin Robbins* 117 Cal. Rptr. 2d 875, 879).

[102] *Id.* (quoting *Baskin Robbins* 117 Cal. Rptr. 2d at n. 3).

### 4. Defendant's motion to dismiss Plaintiff's claim for breach of the Qualified Financing Provision is GRANTED in part.

The second sentence of the QFI Provision states that "[w]ithin 6 months of the closing of the Note investment, the company and [Defendant] *shall negotiate in good faith* with respect to the terms and conditions" on which Defendant would become the lead investor and invest at least an additional $10 million. For the reasons that follow, this provision did not obligate Defendant to invest at least $10 million, thus there can be no breach on this basis; however, the Parties' agreement to negotiate in good faith to determine the means by which Defendant would become the lead investor and invest this minimum amount is enforceable.

*Copeland v. Baskin Robbins U.S.A,* issued by the California Court of Appeals, Second District, speaks directly to the narrow issue presented by Plaintiff's claim for breach of the Amended MOU.[103] In *Baskin Robbins,* the plaintiff-buyer entered into a contract with the defendant-seller to buy an ice cream factory.[104] The contract provided that the parties agreed to negotiate a separate co-packing agreement wherein the defendant would agree to provide the ice cream to the plaintiff over a three-year period.[105] The contract stated that the parties agreed to negotiate the specific terms of the co-packing agreement.[106] Negotiations over the co-packing

---

[103] *Baskin Robbins,* 117 Cal. Rptr. 2d 875.
[104] *Id.* at 878-89.
[105] *Id.* at 878.
[106] *Id.*

agreement failed and the plaintiff filed suit alleging the defendant breached the contract by refusing to enter into a co-packing agreement.[107]  The trial court granted summary judgment to the defendant and the plaintiff appealed.[108]  The appellate court distinguished an "agreement to negotiate" from an "agreement to agree" and found that, while the latter was unenforceable, the former was enforceable.[109]  When parties have agreed to negotiate a specific term or provision, "[f]ailure to agree is not, itself, a breach of the contract to negotiate.  A party will be liable only if a failure to reach ultimate agreement resulted from a breach of that party's obligation to negotiate or to negotiate in good faith."[110]  When parties have agreed to negotiate in

---

[107] *Id.* at 878-79.

[108] *Id.* at 879.

[109] *Id.* at 880-83.

[110] *Id.* at 880 (internal citations omitted).  California courts have repeatedly affirmed and cited to the holding in *Baskin Robbins* that an agreement to negotiate or negotiate in good faith is an enforceable agreement.  *See, e.g., Sheen v. Wells Fargo Bank, NA,* 505 P.3d 625, nn. 4-5 (Cal. 2022); *Machado v. Myers,* 252 Cal. Rptr. 3d 493, n. 9 (Cal. Ct. App. 4th Aug. 16, 2019) (holding "parties' agreement to 'meet and confer' regarding conditions for revocation of the license agreement does not render the agreement unenforceable" (citing *Baskin Robbins*)); *Cedar Fair, LP v. City of Santa Clara,* 123 Cal. Rptr. 3d 667, 681 (Cal. Ct. App. 6th Apr. 6, 2011) (holding term sheet expressly bound parties to continue negotiating in good faith); *Brehm v. 21st Century Ins. Co,* 83 Cal. Rptr. 3d 410, 423 (Cal. Ct. App. 2d. Sept. 16, 2008) (holding defendant's "express contractual right to resolve any remaining disputes by arbitration is not inconsistent with its implied obligation to attempt in good faith to reach agreement with its insured prior to arbitration"); *Keystone Land & Development Co. v. Xerox Corp.*, 353 F.3d 1093, 1097 (9th Cir. 2003) (finding "[m]ost jurisdictions recognize the enforceability of contracts to negotiate in an appropriate case" (citing *Baskin Robbins* and collecting cases in accord)); *In re Sony Gaming networks and Customer Data Security Breach Litigation,* 996 F. Supp. 2d 942, 1013-1014 (S.D. Cal. 2014) (holding "[p]laintiff's claim could be based on an alleged breach of an 'agreement to negotiation'" (citing to *Baskin Robbins*)).

good faith, the defendant has performed his obligations under the contract when it has made a good faith effort to reach an ultimate agreement.[111]

Here, Defendant was obligated to negotiate in good faith to determine the terms and conditions under which it would become the lead investor and provide at least $10 million, but was not obligated to reach an ultimate agreement on the necessary terms. Plaintiff's claim for breach of contract on the basis that Defendant did not provide at least $10 million in additional financing and by not becoming the lead investor is DISMISSED. Plaintiff's claim that Defendant failed to negotiate in good faith to establish the terms under which Defendant could accomplish the goals in the QFI Provision remains pending.

### 5. Defendant's motion to dismiss Plaintiff's claim for breach of the Commercial Agreements Provision is GRANTED in part.

The Commercial Agreements Provision states that "the Parties *agree to negotiate in good faith* to establish a *long-term commercial partnership* across multiple lines of business no later than March 31, 2019."[112] Due to the language in the Amended MOU, Plaintiff's characterization of Defendant's breach, as stated above, is particularly important in adjudicating Defendant's motion to dismiss.

The Court applies the analysis used for the QFI provision to the Commercial Agreements Provision (the "Provision"). Like the QFI Provision, Defendant's

---

[111] *Baskin Robbins,* 117 Cal. Rptr. 2d at 880-81.
[112] Am. MOU (emphasis added).

alleged failure to establish a "long-term commercial partnership" is not a breach of this Provision. The Amended MOU did not require that the parties reach an ultimate agreement on the nature and scope of a long-term commercial partnership. The failure to "negotiate in good faith" to establish this partnership, however, is sufficiently definite to establish that Defendant had an obligation to negotiate the establishment of this partnership.[113]

### a. Plaintiff has stated a claim for breach based on Defendant's failure to "negotiate in good faith."

Defendant asserts that the complaint does not include a claim for breach of the duty to negotiate in good faith and that Plaintiff therefore cannot raise this claim of breach in its opposition to the motion to dismiss.[114] Although Plaintiff does not expressly allege in its complaint that Defendant breached the Amended MOU by failing to negotiate in good faith, the Court has an obligation to generously construe the allegations in the complaint at this stage in the litigation. Plaintiff has alleged generally that Defendant breached the Amended MOU, which includes a provision

---

[113] *See supra* nn. 103-111 and accompanying text. Pursuant to California law, reliance damages (including out of pocket costs of negotiating or perhaps lost opportunity costs) are the only form of damages available for a breach of an agreement to negotiate in good faith. *Baskin Robbins,* 117 Cal. Rptr. 2d at 885. Expectation damages are not permitted because courts have "no way of knowing what the ultimate terms of the agreement would have been or even if there would have been an ultimate agreement." *Id.* Plaintiff has not alleged reliance damages for this claim. Plaintiff only alleges damages in the amount of $10 million or more based on a breach of the QFI provision. Although Defendant does not raise this issue, it could constitute an independent ground for dismissal.

[114] Def. Reply Br. at 18-19.

to "negotiate in good faith."  In the factual background section to Plaintiff's complaint, Plaintiff makes several allegations related to Defendant's alleged refusal to negotiate in good faith.[115]  For these reasons, the Court finds that Plaintiff has alleged breach of contract based on Defendant's alleged failure to negotiate in good faith a long-term commercial partnership.

### b. Plaintiff has not stated a claim for breach based on Defendant's failure to establish a "long-term commercial partnership" with the Company.

Although Plaintiff claims that Defendant had an obligation to enter into a commercial partnership, the phrase "agree to negotiate in good faith" itself shows that the term "long-term commercial partnership" was left to the future agreement of both parties.  Where an essential element of an agreement is left to the "future agreement of both parties, no legal obligation arises 'until such future agreement is made.'"[116]  The plain language of the Provision shows that at the time the Amended MOU was signed, the parties had yet to negotiate, or at least complete negotiations, to finalize the parameters of a "long-term commercial partnership."  If the parties

---

[115] Compl. ¶¶ 23, 28, 29, 42 (shortly after Defendant signed the May 2018 commitment, Defendant refused to respond to numerous communications  and "went dark" as the Company "sought to secure the promised funds with BeautyCon LA looming"; Defendant refused to completely fund its loan agreements and conditioned funding on the Company's pursuit of BeautyCon POP which "stretched the Company to the breaking point"; Defendant's chief of retail was unable (or unwilling) to support BeautyCon POP as Defendant promised; Upon information and belief, Defendant was aware that funding only 25% of the May 2020 Note left many vendors and Company customers unpaid during the pandemic.).

[116] *Baskin Robbins,* 117 Cal. Rptr. 2d at 879 (quoting *City of Los Angeles v. Superior Court*, 333 P.2d 745, 750 (Cal. 1959)).

had already reached an agreement on this term, there would be no need specify that the parties were agreeing to negotiate its establishment.

Even if this Provision had not included the phrase, "agree to negotiate," and had unambiguously stated that "the parties shall establish a long-term commercial partnership," it would still not be sufficiently definite for the Court to determine breach or fashion a remedy. The provision does not define the parameters of a "long-term commercial partnership." It does not specify what amount of time would qualify as "long term." Would Plaintiff have had a claim for breach if the commercial partnership with Defendant broke down after five years, for example, or would Defendant have met its obligation under this provision? Furthermore, while the provision does state that this partnership was to span across "multiple lines of business," there is a lacuna of information as to what would constitute the partnership itself. The Provision does not define the nature and extent of the parties' collaboration or whether it would include any profit-sharing arrangement. Even if the MOU had obligated Defendant to engage in a commercial partnership, without this term being further fleshed out, it would not be possible to determine whether Defendant had breached.

### 6. Defendant's motion to dismiss Plaintiff's claim for breach of the Common Share Acquisition Provision is GRANTED.

The Court finds that the CSA Provision is not enforceable because its terms are not sufficiently definite to determine Defendant's performance obligations with

respect to acquiring shares. While the CSA Provision states that Defendant was to complete acquisition of the shares by a date certain, the provision does not specify whether any shares needed to be acquired for Defendant to have performed. Subsection 3 of the CSA Provision states that Defendant "acknowledges that the total number of shares available for acquisition (*if any*) and the exact pricing is not guaranteed" and is subject to the Company and shareholders receiving approvals for transfer.[117]

The CSA Provision plainly provides for the possibility that Defendant would not acquire any shares because this acquisition depended in part on factors outside of Defendant's control. Thus, under the CSA Provision, it was possible for Defendant to acquire zero shares and not be in breach. In fact, the weight of the obligations in this provision appears to be on the Company rather than Defendant. The Company agreed to use "commercially reasonable efforts" to cooperate with Defendant and determine the optimal structure and mechanism to complete the acquisition. It is fair to assume that the Company's agreement to cooperate with Defendant implies Defendant's agreement to reciprocate that cooperation. The CSA Provision fails, however, to sufficiently define what Defendant had to do or refrain from doing to cooperate in accordance with this Provision. [118] For these reasons,

---

[117] Am. MOU (emphasis added).

[118] *See Ladas v. California State Auto. Ass'n.,* 23 Cal. Rptr. 2d 810, 814 (Cal. Ct. App. 1st, Oct. 22, 1993) (affirming trial court's holding that insurance company's alleged promise to pay parity

there is no workable basis to identify Defendant's obligations and whether Defendant is in breach.

## III.  Fraud in the Inducement

Plaintiff alleges that Defendant fraudulently induced it into executing the MOUs.  Plaintiff claims that during negotiations leading up to the execution of the MOUs Defendant represented that Defendant would perform under them if the Company ceased discussions with other investors. Defendant asserts three grounds for dismissal: (1) Plaintiff's claim is barred by California's statute of limitations; (2) Plaintiff's claim violates the economic loss doctrine; and (3) the allegations of fraudulent inducement do not satisfy Superior Court Civil Rule 9(b).

**Delaware law applies to the procedural ground for dismissal.**

As a threshold matter, both Delaware and California have a three-year statute of limitations for the claim of fraud in the inducement.  Plaintiff does not contest that it did not file this claim within the three-year time period, but argues that the statute of limitations was tolled pursuant to Delaware law for the following reasons: the discovery rule tolls Plaintiffs claims, Defendant fraudulently concealed facts

---

in setting commission rates "is too vague and indefinite to give rise to an enforceable contractual duty."); *Peterson Development Co. v. Torrey Pines Bank,* 284 Cal. Rptr. 367, 374-75 (Cal. Ct. App. 4th Aug. 9, 1991) (holding loan commitment was not enforceable where it did not specify identity of the potential borrower, loan amount, percentage of purchase price, interest rates or repayment terms); *Goldberg v. Santa Clara,* 98 Cal. Rptr. 862, 862-63 (Cal. Ct. App. 1st, Dec. 6, 1971) (finding contract calling for additional compensation if plaintiff achieved "savings to the City of such magnitude" to justify that compensation was too vague to be enforceable).

regarding this claim, this claim is equitably tolled, and the filing of the assignment tolls the statute. Defendant argues in its reply that the statute of limitations is not tolled and also cites exclusively to Delaware law, however, Defendant also asserts California law applies because of the California choice-of-law provision in the MOUs. Although the statutory time period is equivalent, because the parties appear to disagree on which state's law applies, the Court will briefly address the conflict of law issue presented.

As stated above, the MOUs contain a choice-of-law provision wherein the Parties agreed that California law would apply to "all actions arising out of or in connection with this Agreement . . . without regard to the conflicts of law provisions of the State of California or of any other state." However, pursuant to Delaware law, "choice-of-law provisions in contracts do not apply to statutes of limitations, unless a provision expressly includes it. If no provision expressly includes it, then the law of the forum applies because the statute of limitations is a procedural matter."[119] Here, the choice of law provision does not specify whether it includes California's statute of limitations. As such, because statutes of limitations relate to matters of

[119] *Pivotal Payments Direct Corp. v. Planet Payment, Inc.,* 2015 WL 11120934, at *3 (Del. Super. Dec. 29, 2015) (internal citations omitted); *see also Weinstein v. Luxeyard, Inc.,* 2022 WL 130973, at *3 (Del. Super. Jan. 14, 2022); *In re Rehabilitation of Manhattan Re-Insurance Co.,* 2011 WL 4553582, at *8 (Del. Ch. Oct. 4, 2011); *B.E. Capital Management Fund LP v. Fnd.com, Inc.,* 171 A.3d 140, 147 (Del. Ch. Oct. 4, 2017).

procedure, Delaware law applies. Because Delaware's statute of limitations applies, Delaware law with respect to tolling also applies.

"[C]ourts apply a three-step analysis to determine whether a claim is time-barred. First, the court determines when the cause of action accrues. Second, the court determines whether the statute of limitations may be tolled so that the cause of action accrues after the time of breach or injury."[120] If a plaintiff has not filed within the statutory time period, it "bear[s] the burden of pleading specific facts demonstrating that the statute was tolled."[121] The third step in the analysis, assuming tolling applies, is to determine when the plaintiff was on inquiry notice, which is the date the statute of limitations begins to run.[122] Once the plaintiff has discovered "facts sufficient to put a person of ordinary intelligence on inquiry which, if pursued, would lead to discovery" the plaintiff has inquiry notice.[123] A plaintiff need not know of every aspect of the alleged wrongful conduct for the court to find the plaintiff is on inquiry notice, but only when the plaintiff should have discovered the

---

[120] *AssuredPartners of Virginia, LLC v. Sheehan,* 2020 WL 2789706, at *12 (Del. Super. May 29, 2020).

[121] *Puig v. Seminole Night Club, LLC,* 2011 WL 3275948, n. 21 (Del. Ch. July 29, 2011) (quoting *In re Coca–Cola Enters., Inc.,* 2007 WL 3122370, at *6 (Del. Ch. Oct. 17, 2007); *see also Solow v. Aspect Resources, LLC,* 2004 WL 2694916, at *3 (Del. Ch. Oct. 19, 2004)).

[122] *AssuredPartners of Virginia, LLC,* 2020 WL 2789706, at *12.

[123] *S&R Associates, LP v. Shell Oil Co.,* 725 A.2d 431, 439 (Del. Super. Sept. 30, 1998); *Jeter v. RevolutionWear, Inc.,* 2016 WL 3947951, at *10 (Del. Ch. July 19, 2016); *Pivotal Payments Direct Corp. v. Planet Payment, Inc.,* 2015 WL 11120934, at *5 (Del. Super. Dec. 29, 2015).

"general fraudulent scheme."[124]  "[N]o theory will toll the statute beyond the point where the plaintiff was objectively aware, or should have been aware, of facts giving rise to the wrong."[125]

With respect to the first step in the analysis, a claim for fraudulent inducement accrues at the time of the wrongful act, *i.e.*, when the fraudulent statements were made, not when the harmful effects of the wrongful act were felt.[126]  "The fraudulent statements must have occurred on or before the date when the parties entered into the contract."[127]  With respect to the dates of execution of the MOUs, the original MOU does not contain the date that it was signed, though Plaintiff alleges in the complaint that the parties entered into the original MOU in June 2018.[128]  The Company's board of directors approved the original MOU on June 24, 2018.  For the purpose of Defendant's motion, the Court assumes that the original MOU was executed between June 24 and June 30, 2018.  For Plaintiff's claim to be timely filed with respect to the Original MOU, it would have to be filed no later than June 30, 2021, unless the statute is tolled.  The Amended MOU is dated December 16, 2018. For Plaintiff's claim to be timely filed with respect to the Amended MOU, it would have to be filed within three years of that date, unless the statute is tolled.  Plaintiff

---

[124] *Ocimum Biosolutions (India) Ltd. v. AstraZeneca UK Ltd.*, 2019 WL 672836, at *9 (Del. Super. Dec. 4, 2019).
[125] *In re Tyson Foods, Inc.,* 919 A.2d 563, 585 (Del. Ch. Feb. 6, 2007).
[126] *See Pivotal Payments Direct Corp.,* 2015 WL 11120934, at *4.
[127]  *Id.*
[128] The Note referred to in the original MOU is dated June 18, 2018.

filed its complaint on December 13, 2022, therefore, unless a tolling exception applies, Plaintiff's claim is time-barred.

With respect to the second step in the analysis, statutes of limitations may be tolled in "certain circumstances, including fraudulent concealment, inherently unknowable injury [known as the "discovery rule"], and equitable tolling."[129]  To toll the statute of limitations based on fraudulent concealment "the plaintiff must allege some affirmative act by the defendant that either prevented the plaintiff from gaining knowledge of material facts or led the plaintiff away from the truth."[130]  The discovery rule applies where the injury was "inherently unknowable" and the injured party was "blamelessly ignorant."[131]  "When these 'factual requisites' are met, "'the limitations period commence[s] to run when the person ha[s] reason to know that a wrong ha[s] been committed.'"[132]  The limitations period is only tolled until the plaintiff is on inquiry notice.

Plaintiff asserts that its fraudulent inducement claim is tolled by the discovery rule because it was not on notice that it possessed this claim until December 21, 2019, the date Thompson sent the Letter to Ohana.  In support of its position that it

---

[129] *Pivotal Payments Direct Corp.,* 2015 WL 11120934, at *5.

[130] *Jeter v. RevolutionWear, Inc.,* 2016 WL 3947951, at *10 (internal quotations omitted).

[131] *Morton v. Sky Nails,* 884 A.2d 480, 482 (Del. 2005); *Pack & Process, Inc. v. Celotex Corp.,* 503 A.2d 646, 650 (Del. Super. Oct. 16, 1985) (quoting *Pioneer Nat. Title Ins. Co. v. Sabo,* 382 A.2d 265 (Del. Super. Jan. 17, 1978); *S&R Associates, LP v. Shell Oil Co.,* 725 A.2d 431, 439 (Del. Super. Sept. 30, 1998).

[132] *Pack & Process, Inc.,* 503 A.2d at 650 (quoting *Pioneer Nat. Title Ins. Co.,* 382 A.2d 266-67.

was not on notice until this date, Plaintiff cites to paragraphs 32, 38, and 39 of its complaint.[133] Paragraphs 38 and 39 discuss the Letter wherein Thompson indicated Essence Ventures' interest in purchasing the Company. If Plaintiff was not on inquiry notice until December 21, 2019, this would toll the statute until December 20, 2022, seven days after Plaintiff filed the complaint.

The Court does not find that the discovery rule applies because the injury was not inherently unknowable before Thompson sent the Letter on December 21, 2019. Plaintiff alleged that "it was no secret going back to 2018" that Defendant wished to control the Company.[134] Plaintiff also alleges that the Company had to hire an investment banker in July 2019 due to Defendant's failure to provide the promised financing —a little over a year after entering into the original MOU and about seven months after entering into the Amended MOU. The Court finds that Plaintiff has established by its own allegations that it was on inquiry notice it had a claim for fraudulent inducement for more than three years before it filed this claim.

Plaintiff asserts the same grounds in its fraudulent concealment argument as it does for its discovery rule argument, namely the Letter. Plaintiff, however, has failed to articulate how the Letter amounts to an affirmative act that prevented Plaintiff from gaining knowledge of material facts or lead it away from the truth that

---

[133] Paragraph 32 of the complaint alleges that Defendant backchannelled with other Series A investors to chill new investors but does not provide a time frame as to when this occurred.
[134] Compl. ¶ 38.

46

Defendant did not intend to fund the MOUs.[135] Plaintiff bears the burden of asserting specific facts of fraudulent concealment and it has not done so.

Plaintiff's claim of equitable tolling is without merit as it relies on Defendant's alleged role as a fiduciary. The Court dismissed the claim for breach of fiduciary duty on the record after oral argument.[136] Finally, Plaintiff argues the filing of the Assignment tolls the statute. The Court finds that there is no merit to this claim. The Assignment was filed twenty months before Plaintiff filed its claim which provided a reasonable amount of time for the Trust to file the complaint within the statutory time period. Plaintiff has not identified any relevant Delaware caselaw to support its position, and the Court has not identified a case to support tolling on this basis.

Plaintiff's claim for fraud in the inducement is barred by Delaware's statute of limitations because Plaintiff did not file it within the statutory time period and no tolling exception applies. Because Plaintiff's claim is time barred, the Court will not address Defendant's remaining two grounds for dismissal for this claim.

**CONCLUSION**

For the reasons stated herein:

---

[135] *See Jeter v. RevolutionWear, Inc.,* 2016 WL 3947951, at \*10.
[136] *See BeautyCon Media ABC v. New General Market Partners,* C.A. No. N22C-12-143   MAA CCLD, Adams, J., Transaction ID    70026953 (Del. Super. May 16, 2023).

1. Defendant's motion to dismiss Plaintiff's claim of tortious interference with prospective contractual relations is DENIED.

2. Defendant's motion to dismiss Plaintiff's claim of breach of the Original MOU and Amended MOU is GRANTED in part.

   a. Defendant's motion to dismiss Plaintiff's claim of breach of the Original MOU is GRANTED.

   b. Defendant's motion to dismiss Plaintiff's claim of breach of the Amended MOU is DENIED in part.

      i. Plaintiff's claim of breach of the CSA Provision is DISMISSED.

      ii. Plaintiff's claim of breach of the QFI and Commercial Agreements provisions based on Defendant's alleged failure to negotiate those provisions in good faith remains pending; the balance of Plaintiff's claims of breach of these provisions is DISMISSED.

3. Defendant's motion to dismiss Plaintiff's claim of fraud in the inducement is GRANTED, because it was not timely filed and no exception applies to toll the statute.

IT IS SO ORDERED.

/s/ Meghan A. Adams

**Meghan A. Adams, Judge**